# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE | : | Chapter 7 |
| | : | |
| JON A. ROBBINS, | : | |
| | : | Bankruptcy No. 14-18860-AMC |
| DEBTOR | : | |
| | : | |
| FULTON, N.A., | : | |
| | : | |
| PLAINTIFF | : | Adv. Proc. No. 14-688-AMC |
| | : | |
| V. | : | |
| | : | |
| JON A. ROBBINS, | : | |
| | : | |
| DEFENDANT | : | |

Ashely M. Chan, United States Bankruptcy Judge

## OPINION

# TABLE OF CONTENTS

I.      Introduction ................................................................................................................. 1

II.     Facts and Procedural History ..................................................................................... 4

      A.      Background of High Fidelity House, Inc. ......................................................... 4

            1.      Officers and Outside Accountant .......................................................... 4

            2.      HiFi's Accounting Practices ................................................................... 7

                  a.      Refreshed Invoices ................................................................... 7

                  b.      Inventory Valuation .................................................................. 9

                  c.      Advanced Billing ...................................................................... 9

      B.      HiFi Commercial Loans with Fulton ............................................................. 10

            1.      First Meeting ........................................................................................ 10

            2.      Second Meeting .................................................................................... 12

            3.      Third Meeting ....................................................................................... 13

            4.      Refreshing Invoices ............................................................................. 13

            5.      The Loan Agreements ........................................................................... 14

            6.      Drexel Contract .................................................................................... 16

            7.      Borrowing Base Certificates ................................................................ 16

      C.      2012 Covenant Violation .............................................................................. 18

      D.      2013 Covenant Violation .............................................................................. 20

      E.      Fulton Field Examination of HiFi ................................................................. 20

      F.      Liquidation .................................................................................................... 24

      G.      The Debtor's Residential Loans with HiFi ................................................... 27

      H.      The Debtor's Bankruptcy Proceeding ........................................................... 29

III.    Discussion ................................................................................................................. 30

      A.      Fulton's Nondischargeability Claim Under § 523(a)(2)(B) ......................... 31

            1.      Material Falsity Under § 523(a)(2)(B)(i) ............................................. 32

            2.      Insider's Financial Condition Under § 523(a)(2)(B)(ii) ...................... 32

            3.      Reasonable Reliance Under § 523(a)(2)(B)(iii) ................................... 35

            4.      Intent to Deceive Under § 523(a)(2)(B)(iv) ......................................... 36

            5.      HiFi's Borrowing Base Certificates and Financial Statements ............ 37

                  a.      HiFi's Borrowing Base Certificates ........................................ 37

                  b.      HiFi's Financial Statements .................................................... 38

      B.      Fulton's Nondischargeability Claim Under § 523(a)(6) .............................. 46

IV.     Conclusion ................................................................................................................ 51

## I.    INTRODUCTION

In this case, an unfortunate confluence of events caused the demise of a well-established, family owned business and the loss of collateral worth millions of dollars which significantly damaged both parties in this litigation.

Prior to filing for bankruptcy, Jon A. Robbins ("Debtor") was the President and Chief Executive Officer ("CEO") of High Fidelity House, Inc. ("HiFi"), a high end audio visual company founded by his father in 1955. For many years, the Debtor's brother-in-law acted as Chief Financial Officer ("CFO") of HiFi and, in that role, likely began "refreshing" invoices, a practice which had the effect of making invoices that were more than ninety days past due appear current. Although HiFi's sales people generally only refreshed invoices on long term jobs which were still deemed collectible, the practice technically allowed HiFi to borrow higher monthly amounts from its lenders than it was otherwise permitted under its loan documents.

The CFO was ultimately terminated, in part, because he withdrew $700,000 from an entity related to HiFi as an unauthorized loan. At that point, the Debtor offered the CFO position to a long time employee at HiFi who did not have the requisite financial experience to act as CFO, but who the Debtor considered trustworthy and reliable.

In June of 2012, Fulton Bank ("Fulton") agreed to lend HiFi up to $6 million. Fulton required that HiFi submit monthly borrowing base certificates which set forth the inventory and eligible accounts receivable against which HiFi was permitted to borrow. At the beginning of 2013, Fulton loaned another $1.2 million to HiFi in connection with a large contract that HiFi obtained.

Later in 2013, HiFi disclosed to Fulton, and obtained a waiver of, a financial covenant violation from the prior year. However, in 2014, after HiFi suffered substantial losses in

connection with the large contract noted above and disclosed another financial covenant
violation, Fulton became concerned about HiFi's operations.

Although HiFi immediately disclosed its practice of "refreshing" invoices (and advanced
billing which was instituted in 2013) to Fulton's field examiners when Fulton began an
investigation of HiFi's collateral, Fulton ultimately concluded that HiFi had engaged in fraud
during its lending relationship with Fulton as a result of: (1) HiFi's improper inclusion of
accounts receivable, which were more than ninety days past due, in HiFi's eligible accounts
receivable as reported in the monthly borrowing base certificates submitted to Fulton;
(2) Fulton's (mistaken) belief that obsolete and display inventory should not have been included
in the monthly borrowing base certificates; and (3) HiFi's failure to maintain organized and
accurate records in connection with its customers' invoices.

Based upon Fulton's belief that HiFi had defrauded it, Fulton was unwilling to release the
Debtor and his father from their guarantees of HiFi's commercial loans unless the Debtor's
father contributed exempt funds from his IRA account as part of the settlement agreement. When
the Debtor's father refused to do so, Fulton shut down HiFi and liquidated its inventory and
accounts receivable. Although Fulton received over $1 million from HiFi's inventory, it only
received a de minimis amount from its accounts receivable because HiFi's customers were
unwilling to pay HiFi's invoices after it had gone out of business. Fulton ultimately confessed
judgment against both the Debtor and his father in connection with their guarantees of HiFi's
commercial loans.

In this adversary proceeding, Fulton asserts that its claims against the Debtor are
nondischargeable pursuant to § 523(a)(2)(B), based primarily on the inaccurate borrowing base
certificates provided by HiFi to Fulton during their lending relationship. However, Fulton's

reliance upon the borrowing base certificates, which did not present a comprehensive picture of HiFi's assets and liabilities, were insufficient to support its claims because they were not broad enough to constitute statements of HiFi's "financial condition" as required by § 523(a)(2)(B)(ii).

Upon realizing this, Fulton ultimately shifted its focus during trial to the accuracy of financial statements provided by HiFi to Fulton near the end of their relationship. However, Fulton failed to provide any evidence that the financial statements submitted by HiFi to Fulton in June of 2012 or January of 2013 (prior to Fulton's two extensions of credit) were materially false or that they were not in compliance with generally accepted accounting principles ("GAAP"). Specifically, Fulton presented no evidence that HiFi overvalued its inventory during the requisite time period and, in contrast, the Debtor credibly testified that HiFi's premium inventory generally maintained its value over time. Nor did Fulton present evidence in support of its assertion that HiFi's list of "current" accounts receivable in its financial statements included accounts receivable that were not collectible within one year of invoice. The Court therefore concludes that the financial statements relied upon by Fulton to extend credit to HiFi were not materially false.

The Court also concludes that Fulton failed to demonstrate that the Debtor intended to deceive Fulton when HiFi submitted financial statements to Fulton prior to the extensions of credit to HiFi because the Debtor, who was not sophisticated in financial matters, reasonably relied upon HiFi's independent accountant to prepare and submit financial statements to Fulton. Fulton accordingly has failed to demonstrate that its claim against the Debtor in connection with his guaranty of HiFi's commercial loans is nondischargeable under § 523(a)(2)(B).

Fulton has also failed to demonstrate that it has standing to pursue a nondischargeability claim against the Debtor under § 523(a)(6) in connection with the Debtor's drawdown of

- 3 -

$250,000 under a line of credit with Citizens Bank which should have been closed, but was not, after Fulton refinanced the Debtor's mortgages on his personal residence. As discussed below, Fulton has not yet sustained, and may never sustain, an injury in connection with that drawdown and, therefore, does not have standing to pursue such claim at this time. Moreover, even if Fulton sustains an injury related to the drawdown in the future, any claim for such injury would be subject to discharge under § 523(a)(6) as arising from a simple breach of contract.

## II.    FACTS AND PROCEDURAL HISTORY

### A.    Background of High Fidelity House, Inc.

#### 1.    Officers and Outside Accountant

HiFi was founded by the Debtor's father, Saul Robbins ("Saul"), in 1955. Tr. Apr. 22, 7:8–11, ECF No. 58. HiFi supplied and installed premium audio visual systems and components in both commercial and residential properties. Tr. Apr. 11, 11:19–20, ECF No. 54. Its headquarters were in Broomall, Pennsylvania. Tr. Apr. 22, 28:4–7.

The Debtor began working full-time for HiFi in 1976 after he graduated from high school, and started out in HiFi's warehouse. *Id.* at 5:6–6:4. He continued working at HiFi full-time while he attended college and eventually became a sales manager, which involved managing sales at many HiFi stores and supervising sales people at those locations. *Id.* at 5:12–6:15.

In the 1980s, Saul's health began to deteriorate and, by the mid-1980s, he withdrew from the full-time, day-to-day management of HiFi. *Id.* at 8:17–25. During that time, the Debtor became heavily involved in the role of purchasing and management at HiFi. *Id.* at 6:16–18, 7:5–7. In the 1990s, the Debtor became HiFi's Chief Operating Officer ("COO"), and later became CEO and President. *Id.* at 6:22–7:4. The Debtor eventually became a 75% shareholder of HiFi. *Id.* at 9:1–10.

- 4 -

During the Debtor's entire tenure at HiFi, he never participated in the management of HiFi's finances. Tr. Apr. 21, 196:11–16, ECF No. 57. The Debtor graduated from college with a political science degree, never studied finance, never received training in, and had no knowledge of, how to read financial statements and was "not particularly sophisticated in accounting matters." *Id.* at 195:23–25; Tr. Apr. 22, 75:15–17, 141:20–23.

Ken Adelberg ("Adelberg"), who was married to the Debtor's sister, Edna Adelberg ("Edna"),[1] acted as CFO of HiFi. Tr. Apr. 11, 12:18–25; Tr. Apr. 22, 19:7–11. Adelberg supervised HiFi's employees with respect to invoicing, handled all of HiFi's finances and established HiFi's accounting policies. Trial Tr. Apr. 11, 13:1–5; Tr. Apr. 22, 29:1–2, 29:10–11.

In 1994, Paul Sandquist ("Sandquist") joined HiFi as a manager of its Abington, Pennsylvania location and oversaw its sales and operations. Tr. Apr. 11, 11:25–12:9. By 2010, Sandquist was appointed as COO of HiFi and eventually became a 25% shareholder of HiFi. *Id.* at 11:7–11, 13:22–14:2.

In 2007, Tricia Zwaan ("Zwaan") joined HiFi as its Director of Operations and oversaw HiFi's warehouse operations, service department, inventory control, and some minor purchasing. Tr. Apr. 21, 118:20–119:7. Before joining HiFi, Zwaan was involved in operations in the warehouse and service departments at Bryn Mawr Stereo and Tweeter for over thirty-seven years. *Id.* at 117:6–118:2. In 2008, Zwaan assumed additional responsibilities at HiFi related to human resources and payroll, and initially reported directly to the Debtor. *Id.* at 121:8–25. In 2011, Zwaan began to report directly to Sandquist. *Id.* at 122:1–11. In 2012, Zwaan assumed

---

[1] The Debtor ultimately transferred half of his ownership interest in HiFi to Edna, at which point they each became 37.5% shareholders of HiFi. Tr. Apr. 13, 77:9–14, ECF No. 56.

internal accounting duties at HiFi although she had no accounting experience. *Id.* at 124:1–11, 125:12–18.

Beginning in 1986, HiFi retained the accounting firm of Downey Spevak & Associates, Ltd. ("DSA"), to review HiFi's financial statements. Barry Spevak ("Spevak") was a certified public accountant and a partner at DSA who, since 1990, maintained primary responsibility for HiFi's account. Tr. Apr. 11, 13:6–9; Tr. Apr. 21, 171:18–173:13. Throughout the majority of his engagement with HiFi, Spevak's primary contact was Adelberg. Tr. Apr. 21, 174:1–3.

In 2012, the Debtor and his parents decided that Adelberg should "not work within the company any longer." Tr. Apr. 22, 19:20–20:19. The Debtor explained that this decision was made because Adelberg "didn't work. He didn't show up to work on time, he left work early . . . he was [not] totally engaged in the family business." *Id.* at 21:2–6. In addition, it was discovered that Adelberg had made an unauthorized withdrawal of $700,000 from a related real estate partnership which he had booked as a loan. Tr. Apr. 21, 174:4–20; Tr. Apr. 22, 22:12–24. Although the Debtor specifically denied that Adelberg was "fired," he acknowledged that he could no longer trust Adelberg at that point. Tr. Apr. 22, 19:20–24, 57:23–24.

Once it was decided that Adelberg would leave HiFi, Sandquist was offered the position of CFO, which he accepted. Tr. Apr. 11, 14:11–19. Sandquist, however, did not have much, if any, experience in financial matters and never graduated from college. As a result, he leaned heavily on Spevak to discharge his responsibilities. *Id.* at 76:25–78:2.

Shortly thereafter, HiFi's bookkeeper quit and Zwaan became its new bookkeeper. *Id.* at 14:20–15:4; Tr. Apr. 21, 123:10–21, 124:10–11. Zwaan did not have any experience with accounting practices before becoming bookkeeper and was not given any training prior to assuming the new role. Tr. Apr. 21, 115:15–22, 118:3–6, 125:12–25.

2.    HiFi's Accounting Practices

Customers were typically billed at the conclusion of a project by HiFi's sales personnel, and payment terms ranged from 30 to 120 days. *Id.* at 69:19–22; Tr. Apr. 22, 27:4–6, 29:15–17, 86:23–25. Some of HiFi's residential and commercial projects were long term and extended past two years. Tr. Apr. 11, 81:4–5.

At the Debtor's direction, HiFi updated its accounting system in 2013 in order to become "more efficient" and to hold its sales people accountable. Tr. Apr. 21, 163:5–7, 164:25–165:4. In the spring of 2013, HiFi transitioned to QuickBooks accounting software. Tr. Apr. 11, 15:24–16:2. Later that fall, HiFi transitioned to Tigerpaw, an inventory control system and customer relationship management system that integrates with QuickBooks. *Id.* at 16:8–11.

a.    *Refreshed Invoices*

HiFi had a long standing practice of "refreshing invoices," whereby the company would: (1) issue a credit memo for an invoice which was more than ninety days old, but still collectible, and typically related to a large, ongoing project; and (2) generate a new invoice for the credited amount using the updated re-invoice date. *Id.* at 15:5–7, 17:5–10, 82:22–25, 99:16–20; Tr. Apr. 21, 130:2–4. The refreshed invoices were not sent to customers. Tr. Apr. 21, 161:10–13.

Prior to the implementation of QuickBooks and Tigerpaw in 2013, HiFi's sales personnel were individually responsible for refreshing invoices and were able to track an invoice's true age. Tr. Apr. 11, 16:12–16, 66:12–20, 67:19–21. Afterwards, however, Zwaan became responsible for refreshing invoices at the direction of Sandquist. *Id.* at 16:17–20; Tr. Apr. 21, 128:11–16. Sandquist, who decided on a monthly basis which invoices would be refreshed, would frequently consult with Spevak, but only occasionally with the Debtor. Tr. Apr. 11, 16:21–17:4, 17:11–17, 75:10–13. When Zwaan became responsible for refreshing invoices, she began adding the letters "PS" to refreshed invoice numbers in order to distinguish those invoices

- 7 -

from originally issued invoices. *Id.* at 170:15–22; Tr. Apr. 21, 130:12–19. Although Zwaan

could distinguish between new and refreshed invoices in this manner, she did not keep track of

how many times an invoice was refreshed and HiFi did not independently maintain an itemized

list of refreshed invoices. Tr. Apr. 21, 132:15–22.

The Debtor testified at trial that he believed that the practice of refreshing invoices was

legitimate because it had been in place for as long as he could recall. Tr. Apr. 22, 25:12–20,

62:18–19. He denied that the practice was intended to deceive HiFi's lenders with respect to the

true age of HiFi's accounts receivable, and instead asserted that it was intended to enable HiFi to

more accurately understand whether invoices for its long-term projects were collectible. *Id.* at

25:24–26:6, 49:17–20. The Debtor testified that he never discussed HiFi's practice of refreshing

invoices with Spevak because "[i]t was never brought to [the Debtor's] attention that it was out

of the ordinary." *Id.* at 24:22–24, 62:13–17.

Sandquist also testified that he believed that refreshing invoices was legitimate because it

was such a longstanding practice at HiFi and went back to at least the early 2000s. Tr. Apr. 11,

75:3–9. However, unlike the Debtor, Sandquist recognized that the practice of refreshing

accounts receivable permitted HiFi to borrow more from its lenders. He testified that if an

invoice was more than ninety days past due, "we'd have to re-bill it again or you wouldn't be

able to borrow against it." *Id.* at 63:5–10.

Although Spevak was aware of HiFi's practice of refreshing invoices, he did not believe

that such practice had any effect on his review of HiFi's financial statements. Tr. Apr. 21,

181:12–15. Under GAAP, HiFi was permitted to report accounts receivable that were more than

ninety days past due as current assets on its financial statements as long as they were collectible

within one year. Tr. Apr. 11, 211:23–212:3. To the extent such accounts receivable were not

- 8 -

collectible within one year, however, Spevak testified that such accounts would not be

considered "current" under GAAP and had to be reported as "long-term asset[s]" on HiFi's

financial statements. Tr. Apr. 21, 203:4–14. He also testified that Adelberg had previously told

him that HiFi had a policy of refreshing invoices that were more than ninety days past due, but

that all of the refreshed invoices were collectible within a year. *Id.* at 181:3–8. Accordingly,

Spevak did not note the practice of refreshing invoices in HiFi's financial statements and

considered his review of HiFi's financial statements "appropriate." *Id.* at 181:16–19, 202:21–

203:3, 203:22–25.

<em>b.    Inventory Valuation</em>

HiFi's financial statements disclosed that HiFi valued its inventory at the lower of cost or

market. Joint Ex. 7. Based upon the testimony of Spevak and Zwaan, however, it does not appear

that HiFi had a specific policy whereby it would review and revise its inventory values. *Id.* at

80:6–7, 121:2–7, 157:5–8, 191:1–6, Tr. Apr. 22, 72:9–12. Although the Debtor testified that he

would adjust an item's price if he noticed that it changed, he did not recall whether other

employees did so as well, and he was entirely unaware of HiFi's policies regarding inventory

valuation. Tr. Apr. 22, 72:19–73:17.

However, the Debtor testified that HiFi's inventory consisted of "very high-end consumer

[audio and video] electronics" that "could stay current as long as 10 to 12 years" after first

entering the market. *Id.* at 145:11–146:4. In addition, he testified that HiFi's high end inventory

would not just maintain its value, it would sometimes increase in value over time, such that its

value would exceed its cost. *Id.* at 146:5–7.

<em>c.    Advanced Billing</em>

Under GAAP, revenue should be recognized in the period in which it is earned. Tr. Apr.

21, 197:8–198:1. Beginning in 2013, however, HiFi occasionally engaged in the practice of

- 9 -

"advanced billing," whereby it prematurely issued invoices before the underlying projects were completed: "[t]he recognition of revenue preceding the performance of work." Tr. Apr. 11, 174:13–16; Tr. Apr. 21, 133:11–16, 134:10–17. Sandquist instructed Zwaan regarding whether and when to implement this practice. Tr. Apr. 21, 134:4–6.

### B.    HiFi Commercial Loans with Fulton

Prior to entering into a commercial loan with Fulton, HiFi had borrowed $1.5 million under a term loan, and maintained a $4.5 million line of credit, with its longtime commercial lender, Wilmington Trust. Tr. Apr. 13, 78:12–25, ECF No. 56. After Wilmington Trust was acquired by M&T Bank ("M&T"), M&T informed HiFi on March 22, 2012, that it planned to transfer HiFi's accounts to its collateral control team. Tr. Apr. 22, 109:4–21.

In April or May of 2012, Saul spoke with Steve Brightbill ("Brightbill"), a Fulton assistant branch manager who was helping Saul close and transfer several personal accounts that he maintained with Fulton. Tr. Apr. 13, 7:4–12, 9:4–11. During the conversation, Saul expressed his dissatisfaction with M&T, a sentiment that the Debtor later echoed. *Id.* at 10:17–25; *see also id.* at 76:16–77:5 ("[The Debtor] indicated that they were looking for a banker to understand who [they] were and . . . to help them to continue to grow and prosper as a viable entity."). Brightbill testified that many of the clients that M&T acquired through Wilmington Trust were dissatisfied with M&T's services. *Id.* at 10:17–25. At that point, Saul and Brightbill began to discuss the possibility of a commercial relationship between HiFi and Fulton and, thereafter, representatives from both entities set up a meeting to further discuss such relationship. *Id.* at 9:4–11.

### 1.    First Meeting

On May 3, 2012, Brightbill, Betsy Niedziejko ("Niedziejko"), who was a Fulton credit analyst, the Debtor and Sandquist participated in a meeting at HiFi's headquarters ("First Meeting"). *Id.* at 10:3–9, 74:6–20, 76:6–11. Brightbill and Niedziejko viewed the meeting as an

- 10 -

opportunity to tell Fulton's "story" and to understand HiFi's business and the type of relationship

that HiFi wanted. *Id.* at 12:7–15. Brightbill described the meeting as "a higher level

conversation" and Niedziejko described it as "very customary of any typical first appointment"

between Fulton and a prospective borrower. *Id.* at 12:7–15, 84:4–5. Brightbill's primary role was

to introduce Niedziejko to the Debtor and Sandquist; he did not play any role in approving or

reviewing the loans that were ultimately extended to HiFi. *Id.* at 22:20–22, 39:9–18.

      Niedziejko and her notes from the meeting indicated that Sandquist and the Debtor stated

that HiFi's inventory held its value over time, improved with usage, and was commonly

purchased off of display. *Id.* at 37:5–10, 44:17–19, 83:24–84:1; Joint Ex. 62. Overall, Niedziejko

characterized the discussion about HiFi's inventory as "probably a little unique." Tr. Apr. 13,

84:6–7. Sandquist's recollection regarding the discussion of HiFi's inventory was consistent with

Niedziejko's. Tr. Apr. 11, 86:1–16.

      After the meeting, Niedziejko sent the Debtor and Sandquist an email with a standard list

of documents that Fulton needed from HiFi to properly underwrite the loans. Tr. Apr. 13, 13:20–

14:5, 84:10–17, 85:14–19. The requested documents included three years of independently

reviewed financial statements and year-to-date balance sheets, income statements, and accounts

receivable and accounts payable aging reports as of March 31, 2012, for HiFi. Joint Ex. 2.

      In response to Niedziejko's email, Sandquist submitted a number of documents,

including, but not limited to: (1) financial statements for HiFi's Pennsylvania entity from 2008 to

2011,[2] Tr. Apr. 11, 27:21–24, Joint Ex. 7; (2) financial statements for HiFi's Pennsylvania and

Delaware entities for the quarter-ended March 31, 2012, Tr. Apr. 11, 28:11–17, Joint Ex. 8; and

(3) a summary accounts receivable aging report and a detailed accounts payable aging report as

---

[2] HiFi was incorporated in both Pennsylvania and Delaware. Tr. Apr. 11, 27:6–11.

of March 31, 2012, Tr. Apr. 11, 30:22–31:4, Joint Ex. 12. Although Sandquist submitted a

summary, rather than a detailed accounts receivable aging report, Niedziejko acknowledged that

Fulton "relied on the summary . . . report" and that she "felt confident" that the materials HiFi

submitted were "satisfactory" for the purposes of underwriting and approving the loans. Tr. Apr.

13, 180:5–11.

          2.    Second Meeting

On May 11, 2012, there was a second meeting between Brightbill, Niedziejko, and Ken

Goddu ("Goddu") from Fulton, and Sandquist, Spevak, and the Debtor from HiFi ("Second

Meeting"), again at HiFi's headquarters. *Id.* at 14:6–17; 90:3–5. Goddu was a member of

Fulton's senior loan committee, which would confirm whether Fulton would enter into a

commercial loan relationship with HiFi, and he attended the meeting because of the prospect that

HiFi might enter into "a full service relationship" with Fulton. *Id.* at 14:18–15:9, 90:14–91:7. At

the meeting, Fulton was told that HiFi carried approximately $4.3 million of inventory, which

included $1 million of display inventory, and that most of its inventory was "pre-sold." *Id.* at

94:10–14, 95:1–10.

After the meeting, Niedziejko and Goddu discussed Fulton's prospective commercial

lending relationship with HiFi. *Id.* at 96:23–25. Goddu testified that Fulton evaluated prospective

borrowers based upon the character of their management and their history, historical trends, cash

flow, capital, profitability, and independently prepared financial statements. Tr. Apr. 11, 115:23–

116:6. Fulton considered independently prepared financial statements to be especially reliable,

and therefore did not independently validate such statements. *Id.* at 117:19–118:11, 156:20–

157:7. If the relationship manager approved the prospective borrower, a regional loan committee,

which in this case included Goddu, would finally decide whether to approve the loans. *Id.* at

110:19–24, 116:23–117:18. The foregoing practices were industry standard. *Id.* at 119:23–25.

- 12 -

According to Niedziejko, Goddu "was favorable towards the management of the company [and] the fact that they had been in business for decades," during which HiFi had survived many "economic cycles and downturns." Tr. Apr. 13, 97:2–5. Goddu confirmed that Fulton appreciated that HiFi was a closely held, family business. Tr. Apr. 11, 142:2–9. Although Fulton was concerned with HiFi's levels of liquidity, leverage, and inventory, it was impressed with HiFi's cash flow. *Id.* at 138:17–22, 139:6–10, 142:10–12.

On May 25, 2012, the Debtor, in his capacity as CEO, signed a commitment letter with Fulton. Tr. Apr. 22, 40:22–41:24; Joint Ex. 20.

### 3.    Third Meeting

On May 31, 2012, there was a third meeting between Brightbill, Niedziejko, a wealth management representative and a relationship management representative from Fulton, and Saul, his wife Reina, his other son David, and the Debtor, at Saul's house. Tr. Apr. 13, 18:24–19:14, 19:24–20:8; Joint Ex. 61. The meeting was intended to address Saul and Reina's consumer relationship with Fulton. Tr. Apr. 13, 20:9–12. Although Saul ultimately did not use Fulton's wealth management services, he did open an IRA account with Fulton ("IRA Account"). *Id.* at 57:13–20; Joint Ex. 107. The meeting also included a brief discussion of HiFi's commercial relationship with Fulton. Tr. Apr. 13, 20:9–16. No other meetings occurred between Fulton and HiFi prior to the closing of the loans. *Id.* at 21:20–22:4.

### 4.    Refreshing Invoices

At trial, there was conflicting testimony about whether and when representatives from HiFi disclosed the practice of refreshing invoices to Fulton. The Debtor recalled that either he or Sandquist discussed such practice at the First Meeting, but Sandquist and Spevak both believed that the practice was discussed at the Second Meeting. Tr. Apr. 11, 57:25–58:5, 61:12–24; Tr. Apr. 21, 183:17–20, Tr. Apr. 22, 30:20–24, 31:13–19. The Debtor testified that, in response to

HiFi's disclosure about the practice, Niedziejko asked whether HiFi's accounts receivable were "good," to which either Sandquist or the Debtor responded in the affirmative. Tr. Apr. 22, 33:19–34:10, 35:13–16, 36:1–6.

Niedziejko acknowledges that she asked such a question, but that it was merely "a typical question that I ask clients . . . . because it's relevant to bad debt." Tr. Apr. 21, 65:17–66:4. Both she and Brightbill testified that HiFi's practice of refreshing invoices was never raised at any of the meetings. Tr. Apr. 13, 15:14–16, 50:12–20, 53:1–10, 135:18–136:2; Tr. Apr. 21, 57:18–24.

On cross examination, both Goddu and Niedziejko testified that a senior lender at Fulton had sent an email on May 23, 2012, asking whether there were "[a]ny concerns on the over 90 day receivables?" Tr. Apr. 11, 132:24–134:18; Tr. Apr. 21, 59:20–21; Joint Ex. 93. Niedziejko testified that her boss had replied to the email and stated that Fulton had "no concerns" with those accounts receivable because HiFi had assured them that they were still collectible. Tr. Apr. 21, 59:21–24, 62:20–63:9; Joint Ex. 93.

5.    The Loan Agreements

On June 11, 2012, HiFi and Fulton entered into a $1.8 million term loan and a $4.2 million line of credit (collectively, "Initial HiFi Loans"). Tr. Apr. 13, 21:15–19, 99:8–13; Joint Ex. 61. Under the line of credit, Fulton agreed to fund advances up to the combined value of 80% of HiFi's eligible accounts receivable (accounts receivable that were less than ninety days past due), and 60% of HiFi's inventory ("Borrowing Base Formula"), as evidenced by monthly borrowing base certificates prepared by HiFi ("Certificates").[3] Tr. Apr. 13, 99:8–18, 105:2–17;

---

[3] In connection therewith, on June 11, 2012, the Debtor signed the following documents in his capacity as President and CEO of HiFi: (1) two business loan agreements, Tr. Apr. 22, 42:3–13, 43:14–24; Joint Exs. 21, 24; (2) two promissory notes in the principal amounts of $1.8 million and $4.2 million, respectively, Tr. Apr. 22, 42:16–25,

Joint Ex. 20 ¶ 3.a. Fulton did not impose a cap on the amount of inventory against which HiFi

could draw advances, and there were "no exclusions" with respect to the inventory which HiFi

was permitted to use as collateral under the Certificates. Tr. Apr. 13, 99:25–100:13; Tr. Apr. 22,

162:7–9, 163:18–20.

   In addition, the Debtor and Saul each signed personal guarantees of the Initial HiFi Loans

on the same date. Tr. Apr. 22, 43:1–11, 44:17–25, 51:20–24; Joint Exs. 23, 26. At that time, Saul

had assets of approximately $4 million, although $2.8 million of his assets was held in an IRA

Account with Fulton ("IRA Assets").[4] Tr. Apr. 13, 138:5–14; Tr. Apr. 21, 7:18–8:10.

   In connection with the Initial HiFi Loans, the Debtor affirmatively covenanted that HiFi

would "maintain its books and records in accordance with GAAP" and that "all financial reports

required to be provided under this Agreement shall be prepared in accordance with GAAP,

applied on a consistent basis, and certified by Borrower as being true and correct." Tr. Apr. 22,

56:7–18, 57:6–11; Joint Exs. 21, 24. HiFi was also "responsible for the preparation and fair

presentation of [HiFi's] financial statements in accordance with [GAAP] . . . and for designing,

implementing, and maintaining internal control relevant to the preparation and fair presentation

of the financial statements." Tr. Apr. 22, 76:14–21; Joint Ex. 7. The Debtor testified that he

entrusted responsibility for HiFi's compliance with these covenants and obligations with

Sandquist and Spevak. Tr. Apr. 22, 57:12–24, 61:8–11. The Debtor acknowledged that he did not

---

44:3–13; Joint Exs. 22, 25; and (3) two commercial security agreements. Tr. Apr. 22, 46:15–47:17; Joint Exs. 154–55.

   [4] Niedziejko advised Fulton that the Debtor did not meet Fulton's "underwriting standards as an individual guarantor," but that Saul did. Tr. Apr. 11, 145:22–146:1, 147:1–5; Joint Ex. 92. However, Niedziejko denied that Fulton requested that Saul personally guarantee the HiFi Loans; rather, she testified that Saul freely offered his guaranty. Tr. Apr. 13, 139:11–15.

personally take any action to ensure HiFi's compliance with these requirements and admitted that he was not familiar with GAAP requirements. *Id.* at 76:22–24, 141:1–7.

6.    Drexel Contract

On October 3, 2012, Niedziejko, Sandquist, and the Debtor met to discuss HiFi's request for additional funds in connection with a $3.3 million contract that HiFi had secured with Drexel University ("Drexel Contract") and was supposed to be completed within one year. Tr. Apr. 11, 47:3–6; Tr. Apr. 13, 112:15–113:5. In response, Niedziejko requested a copy of the Drexel Contract and HiFi's profit and loss statement ("P&L") through October 2012 to supplement HiFi's 2012 fiscal year budget, which she already had. Tr. Apr. 13, 114:11–19; Joint Ex. 30. On December 3, 2012, Sandquist emailed HiFi's P&L for the year-to-date through October 2012 to Niedziejko and indicated that HiFi recorded a net profit in October, a net loss in November, and expected a "really good" December. Tr. Apr. 13, 115:6–13; Joint Ex. 30.

On January 7, 2013, Fulton extended a short-term $1.25 million line of credit to HiFi in order to fund the Drexel Contract ("Second HiFi Loan," and collectively with the Initial HiFi Loans, "HiFi Loans"). Tr. Apr. 13, 113:1–7, 116:3–15; Joint Ex. 28. In connection with the Second HiFi Loan, the Debtor signed another business loan agreement and promissory note in the principal amount of $1.25 million in his capacity as CEO and President of HiFi. Tr. Apr. 22, 45:1–46:2; Joint Exs. 27–28.

7.    Borrowing Base Certificates

In connection with the HiFi Loans, HiFi was required to submit monthly Certificates in order "to monitor line usage." Tr. Apr. 13, 105:3–6. The Debtor did not personally review, sign, or submit any of the Certificates. *Id.* at 165:21–166:1; Tr. Apr. 22, 140:5–12. Rather, Sandquist was responsible for preparing and submitting the Certificates to Fulton based upon information that he requested from Zwaan. Tr. Apr. 11, 37:6–8.

Niedziejko was in charge of reviewing the monthly Certificates for Fulton. Tr. Apr. 13, 111:5–10. She testified that, when she received the Certificates, she ensured that HiFi had sufficient excess collateral to support the outstanding loan balances by confirming that HiFi was in compliance with the Borrowing Base Formula, and then forwarded the Certificates to Fulton's credit department for tracking. *Id.* at 111:5–10, 168:6–10.

On cross-examination, however, Niedziejko admitted that she did not "specifically remember" reviewing each of HiFi's Certificates, although she testified that she reviewed each borrowing base certificate submitted to her "as a course of action." *Id.* at 170:18–20. In fact, Niedziejko could not recall taking any specific action to ensure that HiFi's Certificates complied with Fulton's policies. *Id.* at 174:24–175:1. Moreover, when Sandquist submitted Certificates which violated Fulton's policies, Niedziejko typically did nothing and rarely contacted Sandquist to correct such violations. Tr. Apr. 11, 79:6–79:20.

Niedziejko was supposed to enforce Fulton's policies which required borrowing base certificates to be timely sent, signed, dated, and submitted with a detailed accounts receivable aging report. Tr. Apr. 22, 157:15–158:13. In contravention of Fulton's policies, HiFi:

(1) Failed to submit any Certificates to Fulton for the first three months after the Initial HiFi Loans closed, although it was required to do so by the fifteenth day after the end of each month, Tr. Apr. 13, 105:21–24, 171:16–18;

(2) Routinely filed late Certificates thereafter, *id.* at 172:1–4;

(3) Submitted fifteen of the nineteen Certificates without any signature, *id.* at 166:2–10; and

(4) Failed to submit a detailed accounts receivable aging report every month,[5] *id.* at 106:6–10, 175:14–17.

---

[5] Neither the Certificates nor the summary reports of accounts receivable submitted by HiFi reflected whether invoices for accounts receivable had been refreshed. Tr. Apr. 11, 67:8–12. However, the first three Certificates that HiFi submitted to Fulton did not list any accounts receivable over ninety days past due, and Debtor's counsel argued that this indirectly disclosed the existence of HiFi's practice of refreshing invoices because Niedziejko "knew at the time" that many of HiFi's projects extended beyond ninety days. Tr. Apr. 21, 74:21–76:11.

At trial, Fulton's Eastern Regional Manager of Special Assets, Cathy Ashley ("Ashley"), testified that Niedziejko "should have been fully aware" of Fulton's policies requiring borrowing base certificates to be signed, dated, and timely submitted with a detailed accounts receivable aging report. Tr. Apr. 22, 156:9–12, 158:9–13. Ashley agreed that HiFi violated Fulton's policies related to the Certificates for the entirety of their business relationship. *Id.* at 160:9–12. Ashley also admitted that many of Fulton's lenders were "sloppy" at the time and that, as a result of the discovery of HiFi's violations, Fulton implemented more "checks and balances" to prevent such violations in the future. *Id.* at 160:25–161:4.

### C.    2012 Covenant Violation

On March 18, 2013, Sandquist and Spevak met with Niedziejko to inform her that Adelberg had improperly manipulated HiFi's accounts receivable during his employment with HiFi, prior to its commercial lending relationship with Fulton. Tr. Apr. 13, 117:9–24. They explained that Adelberg had recorded various "false" accounts receivable and that, as a result, HiFi was going to record a bad debt expense in the amount of $190,000 ("Bad Debt Expense"). *Id.* at 118:2–5, 121:10–17. They also informed her that HiFi was going to violate its debt coverage ratio covenant for 2012 ("2012 Covenant Violation") due to the Bad Debt Expense and requested a waiver of that violation.[6] *Id.* at 119:8–18.

---

Debtor's counsel also noted that the remaining Certificates reflected impossibly low amounts of ineligible accounts receivable. *Id.* at 76:12–77:22.

Niedziejko admitted that Sandquist and the Debtor explained that HiFi's commercial and residential projects typically extended past ninety days. *Id.* at 56:22–57:1, 63:23–64:1, 66:24-67:4. However, she testified that Sandquist and the Debtor "were fully aware" that accounts receivable for such projects could not be used as collateral if they were ninety days past due. *Id.* at 57:2–11. Contradicting herself, she then testified that she assumed that only "a small percentage" of HiFi's projects extended beyond ninety days. *Id.* at 57:5–11.

    [6] Under the Initial HiFi Loans, Fulton was permitted to declare a default if HiFi failed to maintain a "debt-coverage ratio" of 1.2 to 1. Joint Exs. 21, 24.

Niedziejko testified that Sandquist "was devastated," that Spevak "was just beside himself," and that they were both "mortified" and "surprise[d]" by the incident. *Id.* at 117:24–118:1. They "indicated that they were taking this opportunity to look at their books, [and] clean everything up." *Id.* at 118:2–4. According to them, it was "a one-time incident." *Id.* at 119:1–2.

As part of the conversation, Sandquist and Spevak also disclosed that Adelberg was paid a $250,000 severance package upon his departure. *Id.* at 118:13-14, 131:22–23. This surprised Niedziejko because she had previously been told by HiFi that Adelberg had retired. *Id.* at 118:14–18. Niedziejko therefore "began to question the content" of what she had been told in previous meetings.[7] *Id.*

In order to waive the 2012 Covenant Violation, Niedziejko requested on March 19, 2013, interim financial statements and accounts receivable and accounts payable aging reports from Sandquist and Spevak for submission to Fulton's loan committee. *Id.* at 124:3–14, 126:2–14; Joint Ex. 53. On July 16, 2013, Niedziejko spoke with Sandquist and Spevak via telephone to obtain a more detailed understanding of the "sequence of events" related to Adelberg's misconduct. Tr. Apr. 13, 128:24–129:7; Joint Ex. 66. Although they did not tell Niedziejko when they first learned about the Bad Debt Expense, Sandquist and Spevak clarified during the call that Adelberg's manipulation of the false accounts receivable actually comprised only 50% of the Bad Debt Expense and that "truly bad debt accrued over several years" comprised the other 50%. Tr. Apr. 13, 129:18–24.

On July 12, 2013, Niedziejko recommended that Fulton waive the 2012 Covenant Violation due to "the forthrightness and the embarrassment that [Sandquist] [Spevak] had

---

[7] The Debtor was not present at the meeting, and Niedziejko did not subsequently contact him to discuss the Adelberg issue because she "assumed that he was privy to the information" that Sandquist and Spevak disclosed to her. Tr. Apr. 13, 120:20, 188:25–189:2.

displayed," which led her "to believe that they were being honest and that it truly was a one time

event." *Id.* at 132:3–10. Ultimately, Fulton granted a waiver of the 2012 Covenant Violation.

### D.    2013 Covenant Violation

In March 2014, Niedziejko and a Fulton cash management representative attended a

meeting with Sandquist and Spevak where HiFi disclosed that it would post a "significant loss"

for the 2013 fiscal year. *Id.* at 132:19–133:7. Niedziejko was surprised by the loss because

Sandquist and Spevak had previously assured her that they would break-even for the year, "at

worst," and Sandquist had never disclosed any financial issues to Niedziejko throughout the

previous year. *Id.* at 133:10–23. They explained that HiFi's loss was attributable to a "significant

loss" associated with the Drexel Contract. Tr. Apr. 11, 84:5–7; Tr. Apr. 13, 134:2–4.

Niedziejko informed Sandquist and Spevak that Fulton's relationship with HiFi "was not

going in the direction that we had anticipated," and that she intended to refer the relationship to

Ashley. Tr. Apr. 13, 134:4–9. Thereafter, Ashley assumed responsibility for Fulton's relationship

with HiFi. *Id.* at 134:22–135:5. At that point, Niedziejko's only responsibility was to provide

Ashley with "insight and information," and she "had no further contact" with HiFi. *Id.* at 135:6–

10.

### E.    Fulton Field Examination of HiFi

On April 24, 2014, HiFi engaged Michael DuFrayne ("DuFrayne") to advise it in

connection with future discussions with Fulton. Tr. Apr. 11, 161:10–15, 162:2–6, 162:20–163:7.

DuFrayne was a restructuring professional who frequently advised financially distressed

companies regarding their long term viability and strategic alternatives, specifically whether to

sell, reorganize, or liquidate. *Id.* at 160:3–25.

On April 25, 2014, Spevak disclosed HiFi's practice of refreshing invoices to DuFrayne.

*Id.* at 167:14–16, 168:6–20, 210:6–17. DuFrayne testified that he had never previously

encountered such a practice, did not believe it was "proper from an accounting perspective," and advised HiFi to discontinue it until receiving approval from Fulton. *Id.* at 172:11–16, 173:3–7. However, DuFrayne did not believe that the practice materially impacted HiFi's financial statements because an account receivable could simultaneously be more than ninety days past due and still collectible within one year as required by GAAP. *Id.* at 211:7–213:4. When DuFrayne discussed the practice with Sandquist, Zwaan, and the Debtor at a follow-up meeting, none of them seemed surprised to hear about the practice. *Id.* at 171:13–24.

On April 30, 2014, Zwaan disclosed HiFi's practice of advance billing to DuFrayne. *Id.* at 173:14–25. Although DuFrayne did not believe that the practice "skewed" HiFi's financial statements, he did state that it was improper from an "accounting perspective." *Id.* at 176:7–15.

On May 6, 2014, at the request of Fulton, Stephanie Mesnick ("Mesnick") and Tracie Bressler ("Bressler"), who were employed by Trump Lender Services, Inc., initiated a field examination of HiFi to discover "weaknesses" within HiFi's collateral base. Tr. Apr. 12, 14:16–23, 15:19–21, ECF No. 55; Tr. Apr. 22, 189:3–14. Mesnick was the lead examiner and was in charge of reviewing HiFi's inventory; Bressler was in charge of reviewing HiFi's accounts receivable. Tr. Apr. 12, 15:1–17. Because it was beyond the scope of their engagement, Mesnick and Bressler did not review any of the financial information submitted to Fulton prior to the closing of the Initial HiFi Loans in June 2012. *Id.* at 138:25–139:12.

DuFrayne immediately disclosed HiFi's practices of refreshing invoices and advanced billing to Mesnick and Bressler. Tr. Apr. 11, 178:2–3, 180:4–6; Tr. Apr. 12, 15:24–16:2, 98:4–12. When Bressler communicated this information to Ashley, she did not dispute that HiFi had previously told Fulton about its practice of refreshing invoices. Tr. Apr. 12, 156:15–157:9.

For her part of the field examination, Mesnick compared HiFi's "inventory perpetual" to its other documentation, including its financial statements, general ledger, and Certificates.[8] *Id.* at 20:8–13. For the seven months of data available to Mesnick between September 2013 and March 2014, she observed that the amount of inventory on HiFi's general ledger and Certificates consistently exceeded the amount of inventory on its inventory perpetual by $300,000 to $500,000. *Id.* at 22:23–23:10.

DuFrayne was unconcerned about the variance between HiFi's general ledger and Certificates on one hand, and its inventory perpetual on the other, because he believed that it was immaterial relative to $3 million of inventory. Tr. Apr. 11, 213:11–214:7. Moreover, he attributed the most recent month's inconsistency in part to obsolete inventory and in part to ongoing, but unbilled projects. Tr. Apr. 12, 23:18–24:13.

Mesnick also tested HiFi's inventory perpetual to determine whether the costs of the items reported therein were overstated or understated relative to the costs reflected on the most recent vendor invoices. *Id.* at 31:12–13, 33:19–20. Accordingly, she requested that HiFi produce the most recent vendor invoices for approximately one hundred items on the perpetual, but HiFi produced only fifty-seven.[9] *Id.* at 29:18–22. Mesnick then selected an additional twenty items for

---

[8] HiFi maintained an "inventory perpetual" after it updated its accounting systems in 2013, which was "a detailed listing of inventory by type, quantity and purchase price" that would "feed into the inventory listing on the general ledger." Tr. Apr. 11, 181:2–9; Tr. Apr. 12, 22:21–23. As units of a particular item were purchased or sold, its count on the inventory perpetual would increase or decrease such that the inventory perpetual would be a "snapshot" of HiFi's inventory "at any point in time." Tr. Apr. 12, 19:24–20:4.

[9] Mesnick testified that it was "very unusual" for a company to be unable to produce such a large amount of vendor invoices to support its inventory costs and considered it to be a "red flag." Tr. Apr. 12, 35:1–3, 89:11–14. However, Zwaan testified that HiFi encountered difficulties producing the invoices, and other documents Mesnick and Bressler requested, because they related to customers and projects that predated the installation of HiFi's new accounting system. Tr. Apr. 21, 138:22–25. Under the previous accounting system, HiFi did not maintain its records in one place. *Id.* at 138:7–9. As a result, HiFi needed to locate and retrieve records from HiFi's previous accounting system, its inventory system, and its sales people to comply with Mesnick's request, but it lacked the manpower to do so by the deadline given. *Id.* at 135:19–24, 136:12–16, 137:8–12, 138:4–6. Moreover, some sales people did not maintain the requested records. *Id.* at 147:5–21.

which she already had invoices from previous tests. *Id.* at 31:17–19. Ultimately, she tested approximately 40% of HiFi's inventory and determined that HiFi's inventory perpetual overstated its inventory costs by an average of 4.3%, which she admitted was immaterial. *Id.* at 34:2–6, 37:3–4, 78:1–3, 80:2.

Mesnick further examined HiFi's inventory to assess its composition. She determined that, although 57% of HiFi's inventory was warehouse inventory, 43% was "showroom inventory," which, in her opinion, loses value over time because "it's out of the box, it's been used, people have been touching it, [and] it's covered in dust." *Id.* at 39:24–40:4, 41:23–25. Additionally, 62% of its warehouse inventory was considered "slow moving," or over one year old. *Id.* at 38:7–12, 40:18–20. Finally, a significant portion of HiFi's inventory was considered to be "excess units." *Id.* at 42:20–21. Mesnick concluded that HiFi did not employ "the best inventory practice[s]" and recommended that Fulton restrict the types of inventory that could be considered collateral under the HiFi Loans. *Id.* at 56:18–22.

Finally, based on her discussions with HiFi, Mesnick concluded that the value of only one piece of inventory was actually adjusted in the inventory perpetual to the lower of cost or market. *Id.* at 44:21–45:4. However, Mesnick did not test the market value of HiFi's inventory to determine whether any items required adjustments. *Id.* at 75:20–23.

For her part of the field examination, Bressler performed four accounts receivable tests: (1) an "invoice test" to determine whether HiFi's invoices were valid and delivered to its customers in connection with work actually performed and completed; (2) a "credit memo test" to determine why accounts receivable credits were issued, e.g., for billing errors, allowances, or rebates; (3) a "cash application test" to compare accounts receivable aging reports and determine why accounts receivable were removed from the reports, e.g., for payment; and (4) a "past due

review" to determine why invoices became, or might become, more than ninety days past due. *Id.* at 95:15–96:12. The scope of Bressler's analysis was limited to HiFi's accounts receivable from March 2013 to March 2014. *Id.* at 139:13–21.

To perform these tests, Bressler required accounts receivable aging reports, but the reports that DuFrayne initially provided to her were invalid because they contained refreshed invoices and advanced billings. *Id.* at 96:13–15, 98:15–17. DuFrayne then provided a revised accounts receivable aging report to Bressler as of March 31, 2014, which only omitted the advanced billings. *Id.* at 99:1–9, 108:19–23; Joint Ex. 58. The original detailed accounts receivable aging report stated eligible accounts receivable in the amount of $1.84 million, whereas the revised report stated eligible accounts receivable in the amount of $1.43 million. Tr. Apr. 12, 103:12–17.

Bressler subsequently determined that, of the $1.43 million of eligible accounts receivable, $775,000 was actually attributable to refreshed invoices that were more than ninety days past due, the majority of which were refreshed multiple times. *Id.* at 131:12–19, 132:14–16. However, she admitted that she had no idea if the $775,000 of refreshed invoices were collectible within one year of the date that they were originally invoiced because HiFi did not document how many times it refreshed such invoices. *Id.* at 142:16–23. Finally, Bressler testified that she did not believe that anyone at HiFi tried to hide the practice of refreshing invoices from her and that HiFi was very open with her about the practice. *Id.* at 141:7–11.

### F.  Liquidation

On May 9, 2014, HiFi and DuFrayne met with Fulton to discuss HiFi's liquidity issues— its cash flow, its outstanding checks, and how it could collect accounts receivable and continue operations or "sell itself as a going concern." Tr. Apr. 11, 186:5–13, 207:2–11. Following the meeting, it was DuFrayne's understanding that, although HiFi's credit line would be frozen, HiFi

- 24 -

anticipated that Ashley would review and approve a list of outstanding checks that HiFi asked Fulton to honor.[10] *Id.* at 208:19–25, 218:9–20. Accordingly, DuFrayne prepared a thirteen-week cash flow that outlined a plan for HiFi to operate on a cash collateral budget using the expected cash flow from its existing accounts receivable rather than its credit line. *Id.* at 163:22–164:1, 209:11–15.

Ashley subsequently indicated, however, that the checks would not be honored and that Fulton would charge overdraft fees. DuFrayne described this as "a watershed event" because the thirteen-week cash flow was insufficient to pay the checks. *Id.* at 217:11–218:2. When HiFi's outstanding checks to its vendors and employees then bounced, it resulted in a "tipping point," according to Sandquist. *Id.* at 90:17–91:5. On May 23, 2014, Fulton notified HiFi, Saul, and the Debtor that HiFi was in default of the HiFi Loans even though HiFi was current on its payment obligations to Fulton. Joint Pretrial Statement 3, 8, ECF No. 28.

Subsequently, Ashley rejected settlement offers by Gramophone, Ltd. ("Gramophone"),[11] and by the Debtor.[12] Ashley rejected the Debtor's offer because, based on her prior experiences, she expected Saul to voluntarily withdraw funds from his IRA Account to contribute to a global settlement "if he was a person of integrity." Tr. Apr. 22, 203:10–21. Thus, she rejected the Debtor's offer in order to persuade Saul to "sweeten the pot." *Id.* at 204:3–6. In the absence of Saul's contribution of IRA funds, she felt that the Debtor's offer was inadequate. *Id.* at 203:18–

---

[10] At the time that Fulton froze HiFi's credit line, Fulton had only advanced between $4 million and $5 million, and there was more than $1 million of credit available to HiFi. Tr. Apr. 22, 178:24–179:3, 220:2–4.

[11] Gramophone was a competitor of HiFi located in Maryland. Joint Pretrial Statement 4. Gramophone offered Fulton $1.5 million for HiFi's business assets and an unconditional release of the Debtor's guaranty. *Id.* Gramophone requested the unconditional release of the guaranty because it intended to employ the Debtor in its business. *Id.* at 8. Gramophone revised its offer to $1.6 million for HiFi's business assets, excluding its accounts receivable, when it learned that Fulton planned to liquidate HiFi's assets. *Id.*

[12] The Debtor offered Fulton all of his nonexempt assets, which were worth between $300,000 and $500,000, to satisfy his and Saul's guaranties and to avoid bankruptcy. Tr. Apr. 22, 202:2–203:3.

21. As of May 31, 2014, Fulton was "exploring" how to acquire the mandatory distributions of Saul's IRA Assets in connection with his personal guaranty of the HiFi Loans.[13] *Id.* at 198:25–199:4. On June 12, 2014, Fulton confessed judgment against HiFi, Saul, and the Debtor in the amount of $6.73 million. Joint Pretrial Statement 3.

On July 8, 2014, DuFrayne sent Fulton an accounts receivable aging report which, for the first time, included comments from HiFi regarding the collectability of such accounts. Tr. Apr. 11, 197:12–198:1. The report indicated that only $544,000 of HiFi's approximately $1 million of accounts receivable was collectible as of June 30, 2014. *Id.* at 198:20–199:4. DuFrayne testified, however, that at the time the report was issued, HiFi had been closed for four weeks which decreased HiFi's ability to collect those accounts receivable. *Id.* at 201:20–24, 205:6–11, 206:9–19. Fulton ultimately liquidated HiFi's accounts receivable and inventory and, although it did not collect much on the accounts receivable, it netted approximately $1.2 million on the inventory. Tr. Apr. 22, 220:11–18.

After HiFi ceased operations, the Debtor initially began working for a digital marketing startup in Raleigh, North Carolina, as an enterprise sales manager. *Id.* at 137:3–13. The Debtor later transitioned to a company similar to HiFi in Barrington, Illinois, where he currently works as an executive director with substantially similar responsibilities as those he performed for HiFi.

---

[13] Ashley denied that Fulton ever sought to acquire Saul's IRA Assets before they were withdrawn from his IRA Account. Tr. Apr. 22, 200:2–14. In fact, she stated that Fulton's policies prohibited IRAs from serving as collateral for loans because Fulton could not legally execute or seize upon IRA funds. *Id.* at 197:11–19.

At her deposition, Niedziejko stated that, at the time of the closing on the Initial HiFi Loans, she did not have an understanding about whether federal or state law prohibited Fulton from executing upon Saul's IRA Assets. Tr. Apr. 13, 146:1–6. However, after extensive cross-examination at trial, she admitted that, at the time of the closing on the Initial HiFi Loans, she had understood that Fulton could only execute upon Saul's IRA Assets after they were withdrawn from his IRA Account and distributed to him. *Id.* at 158:20–159:5. Niedziejko also admitted on cross-examination that, although bank regulators had questioned her belief that "Fulton's policy allows us to rely on IRA assets of individuals greater than 59½ for liquidity covenant," she apparently failed to disclose this exchange during her deposition. *Id.* at 157:19–21; Tr. Apr. 21, 33:24–34:4.

*Id.* at 137:11–138:19. The Debtor has maintained that he is "unqualified" to manage a business from a financial perspective. *Id.* at 139:16–22.

### G.    The Debtor's Residential Loans with HiFi

On September 17, 2012, the Debtor signed two notes in favor of Fulton (collectively, "Residential Loans") in order to refinance two loans previously issued to him, both of which were secured by his personal residence located at 8 Alyssa Circle in Malvern, Pennsylvania ("Property"). Compl. ¶ 42, ECF No. 1; Tr. Apr. 13, 59:21–24; Joint Exs. 77–78. Specifically, the Debtor signed: (1) a note in favor of Fulton in the amount of $417,000 ("First Alyssa Note") to satisfy the first mortgage on his Property held by Wells Fargo; and (2) a note in favor of Fulton in the amount of $260,000 ("Second Alyssa Note") to satisfy the second mortgage on his Property held by Citizens Bank. Compl. ¶¶ 43–46; Tr. Apr. 22, 127:5–21. The Citizens Bank mortgage secured a $260,000 line of credit ("Citizens Line") previously extended by Citizens Bank to the Debtor. Tr. Apr. 22, 127:13–18.

Although both Fulton and the Debtor intended for the Citizens Line to be closed after Fulton refinanced it, Fulton failed to close the Citizens Line. Tr. Apr. 13, 25:12–19. Brightbill, who was in charge of servicing the Residential Loans, attempted to deliver a pay-off notice, signed by the Debtor, to Citizens Bank ("Pay-Off Notice") four days after the Residential Loans closed. *Id.* at 25:23–26:2, 27:2–28:1. The Pay-Off Notice stated that the Debtor "request[ed] that this account be permanently closed to further advances and a discharge of mortgage be issued."[14] *Id.* at 28:2–15; Joint Ex. 83.

---

[14] Brightbill testified that Fulton opened a title insurance policy for the Wells Fargo mortgage and that he did not recall whether Fulton opened a policy for the Citizens Bank mortgage. Tr. Apr. 13, 60:9–23. However, he testified that Fulton typically did not require title insurance for a mortgage of the size of the latter. *Id.* at 60:19–21. In fact, Fulton did not open a title insurance policy in connection with the Citizens Bank mortgage. Tr. Apr. 22, 208:2–20.

However, when Brightbill delivered the Pay-Off Notice to Citizens Bank, the Citizens Bank teller returned it to Brightbill and indicated that "it was not something that they needed for their records." Tr. Apr. 13, 27:2–27:11, 63:15–19, 64:8–10, 66:16–18. Although Brightbill was given a receipt for the funds used to pay down the Citizens Line, he "did not follow-up" with Citizens Bank afterwards to ensure that the Citizens Line was closed, nor did he notify anyone at Fulton that Citizens Bank had not accepted the Pay-Off Notice. *Id.* at 63:19–22, 65:14–21.

Indeed, Citizens did not close the Citizen Line and continued to send statements to the Debtor which reflected that the Citizens Line was still open for the Debtor to draw down on. Tr. Apr. 22, 131:8–13. At that time, the Debtor did not realize why the Citizens Line remained open. *Id.* at 131:14–17. Fulton admitted at trial that the Debtor was not responsible for the failure of Citizens Bank to close the Citizens Line and that the Debtor "did everything he was supposed to do" in connection with the closing of the Citizens Line. *Id.* at 210:10–17.

On January 8, 2014, Fulton obtained a credit report on the Debtor which indicated that the Citizens Line was still open. Tr. Apr. 13, 189:19–190:15; Joint Ex. 100. However, Fulton did not take any further action to close the Citizens Line. Tr. Apr. 13, 65:22–24.

In February or March 2014, the Debtor drew down two advances on the Citizens Line totaling $250,000 ("Drawdown") and reinvested the entire amount in HiFi in order to recapitalize the company. Tr. Apr. 22, 131:18–25, 143:13–24. The Debtor did so because HiFi was facing a temporary cash deficit and because it was customary for the Robbins family to invest personal funds in the company in such situations, pending the expected payment of outstanding accounts receivable. *Id.* at 132:3–11. Saul also invested personal funds into the company at that time. *Id.* at 142:23–24.

Although the Drawdown essentially eroded Fulton's lien position on the Property by

$250,000, the Debtor credibly testified that he did not understand how drawing upon the Citizens

Line would affect the priority of Fulton's mortgages on his Property, and that he did not intend to

harm Fulton. *Id.* at 144:10–21, 233:19–22. He also denied that he drew upon the Citizens Line

out of anger towards Fulton. *Id.* at 151:25–152:4.

### H.    The Debtor's Bankruptcy Proceeding

On November 11, 2014, the Debtor filed a Chapter 7 voluntary bankruptcy petition. On

December 22, 2014, Fulton filed a proof of claim against the Debtor in the amount of $5.35

million ("Claim"), of which approximately $4.44 million related to the Debtor's guaranty of the

HiFi Loans ("HiFi Guaranty Claim"). Compl. ¶ 56.

Apparently, Fulton ultimately sold the First Alyssa Note to an undisclosed third party

bank ("Bank"), but alleged that it is the servicer for such loan. *Id.* ¶ 54. Neither the Bank nor

Fulton filed a proof of claim in connection with the First Alyssa Note or Second Alyssa Note. *Id.*

¶ 57; Claim 1-1, *In re Robbins*, Bankr. No. 14-8860 (Bankr. E.D. Pa. Dec. 22, 2014).

On December 22, 2014, Fulton filed an adversary complaint ("Adversary Complaint")

against the Debtor and sought a determination that: (1) the HiFi Guaranty Claim be deemed

nondischargeable under § 523(a)(2)(B); and (2) "an additional $232,791.81 of the claim of

Fulton Bank, N.A." be deemed nondischargeable under § 523(a)(6), presumably in connection

with the Second Alyssa Note. Compl. ¶¶ 65, 72. On March 2, 2015, the Debtor filed an answer

("Answer") asserting, *inter alia*, the unclean hands doctrine as an affirmative defense to the

Adversary Complaint. Answer ¶ 78, ECF No. 5.

After the parties filed pretrial statements and briefs, a five-day trial was held on the

Adversary Complaint between April 11, 2016, and April 22, 2016. At trial, the parties

acknowledged that, although the Property was supposed to be sold at a foreclosure sale, the sale

has not yet occurred. Tr. Apr. 22, 235:4–11. The parties subsequently filed proposed findings of

fact and conclusions of law, as well as post-trial briefs and reply briefs. The issues raised by the

Adversary Complaint are now ripe for decision.

## III.    DISCUSSION

The Bankruptcy Code provides debtors with the opportunity to "reorder their affairs,

make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future

effort, unhampered by the pressure and discouragement of preexisting debt.'" *Grogan v. Garner*,

498 U.S. 279, 286 (1991) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)). Section

523(a) of the Bankruptcy Code, however, provides that "[a] discharge under section 727 . . . of

this title does not discharge an individual debtor" from certain categories of debts. 11 U.S.C.

§ 523(a).

The nondischargeability provisions of the Code "reflect a congressional decision to

exclude from the general policy of discharge certain categories of debts," including "liabilities

for fraud." *Grogan*, 498 U.S. at 287. "Congress evidently concluded that the creditors' interest in

recovering full payment of debts" incurred pursuant to fraud "outweighed the debtors' interest in

a complete fresh start." *Id.* at 287. Thus, the "fresh start" policy is limited to the "honest but

unfortunate debtor." *Id.* at 286–87 (quoting *Local Loan Co.*, 292 U.S. at 244); *see also In re

Bocchino*, 794 F.3d 376, 380 (3d Cir. 2015).

The burden to prove that a debt is nondischargeable under § 523(a) is "upon the creditor,

who must establish entitlement to an exception by a preponderance of the evidence." *In re Cohn*,

54 F.3d 1108, 1114 (3d Cir. 1995). In *In re Cohn*, 54 F.3d 1108 (3d Cir. 1995), the court stated

that "the creditor at all times retains both the burden of proof and the burden of production

regarding all four elements" of subsection (a)(2)(B), and that exceptions to discharge under

§ 523(a) "are strictly construed against creditors and liberally construed in favor of debtors." *Id.*
at 1113, 1120.

In this adversary proceeding, Fulton asks the Court to determine that: (1) the HiFi
Guaranty Claim is nondischargeable under § 523(a)(2)(B), as a debt incurred in connection with
credit obtained by certain materially false written statements; and (2) the Debtor's obligation
under the Second Alyssa Note is nondischargeable under § 523(a)(6) as a debt for a willful and
malicious injury. 11 U.S.C. §§ 523(a)(2)(B), (6).

### A.    Fulton's Nondischargeability Claim Under § 523(a)(2)(B)

Section 523(a)(2)(B) provides that a debt for "an extension, renewal, or refinancing of
credit" is nondischargeable "to the extent obtained by" a written statement:

> (i) that is *materially false*;
>
> (ii) respecting the debtor's or an insider's *financial condition*;
>
> (iii) on which the creditor to whom the debtor is liable for such . . . credit *reasonably relied*; and
>
> (iv) that the debtor caused to be made or published with *intent to deceive*.

*Id.* § 523(a)(2)(B) (emphasis added). Thus, as a threshold matter, a creditor must demonstrate
that a debtor made an "actionable misrepresentation" <u>before</u> the debtor obtained an extension,
renewal, or refinancing of credit from the creditor. *In re Booher*, 284 B.R. 191, 200–01 (Bankr.
W.D. Pa. 2002). Otherwise, the creditor could not demonstrate that it issued the credit in reliance
upon the debtor's misrepresentation. *Id.*; *see also In re Braathen*, 364 B.R. 688, 699 (Bankr.
D.N.D. 2006) ("The language 'obtained by' clearly indicates that the fraudulent conduct
occurred at the inception of the debt, i.e., the debtor committed a fraudulent act to induce the
creditor to part with its money, property or services.").

1.    Material Falsity Under § 523(a)(2)(B)(i)

A materially false statement is "an important or substantial untruth." *Cohn*, 54 F.3d at

1114 (quoting *In re Bogstad*, 779 F.2d 370, 375 (7th Cir. 1985)). "A finding of material falsity

may be premised upon the inclusion of false information or the exclusion of information

regarding the debtor's [or an insider's] financial condition." *In re Chryst*, 177 B.R. 486, 499

(Bankr. E.D. Pa. 1994). Section 523(a)(2)(B)(i) articulates a question of law that is determined

pursuant to an objective standard. *Cohn*, 54 F.3d at 1115.

Whether a false statement qualifies as material depends on "the effect of the falsity on the

creditor's decision to enter into the transaction," i.e., "whether the lender would have made the

loan had he known of the debtor's true financial condition." *Id.* at 1114 (quoting *Bogstad*, 779

F.2d at 375). However, such effect is merely an "indicia of the materiality of the falsity," and

actual reliance is unnecessary if "a reasonable person would have relied upon [the falsity] . . . in

the case at hand."[15] *Id.* Thus, a false statement may have been material if it was "capable of

influencing, or had a natural tendency to influence, a creditor's decision." *Id.* at 1115; *accord In*

*re Chan*, Bankr. No. 06-13521ELF, Adv. No. 06-00623ELF, 2008 WL 5428271, at *15 (Bankr.

E.D. Pa. Dec. 31, 2008).

2.    Insider's Financial Condition Under § 523(a)(2)(B)(ii)

Section 523(a)(2)(B)(ii) requires that the written statement respect "the debtor's or an

insider's financial condition." 11 U.S.C. § 523(a)(2)(B)(ii). The term "insider" is defined in the

Bankruptcy Code and includes, *inter alia*, a "corporation of which the debtor is a director,

officer, or person in control." *Id.* § 101(31)(A)(iv). The term "financial condition," however, is

---

[15] Thus, although the reliance "component" of subsection (i) and the reliance "requirement" of subsection (iii) "are certainly overlapping concepts," the former may be satisfied merely if it would have been *reasonable* if the creditor had relied on the falsity, whereas the latter (discussed below) may be satisfied only if the creditor *actually* relied on the falsity. *Cohn*, 54 F.3d at 1114–15.

not defined in the Bankruptcy Code and the Third Circuit has yet to address its meaning. *In re Witmer*, 541 B.R. 769, 782 (Bankr. M.D. Pa. 2015) (citing *In re Feldman*, 500 B.R. 431, 436–38 (Bankr. E.D. Pa. 2013)).

However, the majority of courts which have analyzed this issue have adopted a strict interpretation of this term to "refer[] only to the debtor's overall financial condition, such as the debtor's solvency or net worth."[16] *Feldman*, 500 B.R. at 436 (citing cases). The strict interpretation thus "limits an actionable statement of financial condition to financial-type statements including balance sheets, income statements, statements of changes in financial position, or income and debt statements." *Id.* at 437 (quoting *In re Joelson*, 427 F.3d 700, 711–12 (10th Cir. 2005), *cert. denied sub nom. Joelson v. Cadwell*, 547 U.S. 1163 (2006)).

Under the strict interpretation, borrowing base certificates do not qualify as written statements about a borrower's "financial condition" because they do not present the creditor with a comprehensive view of the borrower's overall net worth. *See In re Cohen*, 599 F. App'x 192, 193 (5th Cir. 2015) (affirming the district court's decision that borrowing base certificates were not statements respecting the borrower's financial condition because they did not list the [t]he borrower's other assets, such as equipment or cash, and they failed to provide any information

---

[16] The majority view is supported by the Fifth, Ninth, and Tenth Circuits and the First and Sixth Circuit Bankruptcy Appellate Panels. *See In re Bandi*, 683 F.3d 671, 676–78 (5th Cir. 2012) (concluding that the term "financial condition" refers to "terms commonly understood in commercial usage" and is not "a broadly descriptive phrase intended to capture any and all misrepresentations that pertain in some way to specific assets or liabilities of the debtor"), *cert. denied sub nom. Bandi v. Becnel*, 133 S. Ct. 845 (2013); *In re Joelson*, 427 F.3d 700, 714 (10th Cir. 2005) (concluding "that the strict reading of 'respecting the debtor's . . . financial condition' is correct"), *cert. denied sub nom. Joelson v. Cadwell*, 547 U.S. 1163 (2006); *In re Kirsh*, 973 F.2d 1454, 1457 (9th Cir. 1992) (declining to apply § 523(a)(2)(B) because the statement "did not purport to set forth the debtors' net worth or overall financial condition"); *In re Kosinski*, 424 B.R. 599, 609–10 (B.A.P. 1st Cir. 2010) (concluding that "[t]he normal commercial meaning and usage of 'statement' in connection with 'financial condition' denote either a representation of an entity's overall net worth or an entity's overall ability to generate income"); *In re May*, No. 06-8044, 2007 WL 2052185, at *7 (B.A.P. 6th Cir. July 19, 2007) (concluding that "a narrow interpretation, defining financial condition as statements that are made regarding a debtor's overall net worth, assets and liabilities, best adheres to the meaning and purpose of the Bankruptcy Code").

about the borrower's liabilities); *In re Kakde*, 382 B.R. 411, 422 (Bankr. S.D. Ohio 2008)

(concluding that, under the "strict interpretation" of the term "financial condition," the borrowing

base certificates submitted to the lender in that case did not qualify as statements about the

borrower's financial condition because they omitted assets such as machinery, equipment,

vehicles, and "substantial liabilities," and therefore "were not intended," nor did they serve to

provide the creditor with "more comprehensive asset and liability information").

Only the Fourth Circuit broadly interprets the term "financial condition." *See Engler v.*

*Van Steinburg*, 744 F.2d 1060, 1060–61 (4th Cir. 1984) (concluding that "Congress did not

speak in terms of financial statements. Instead it referred to a much broader class of statements . .

. ."). The justification underlying this minority view is that the Bankruptcy Code uses the broader

term "financial condition," rather than "financial statement," and that statements concerning the

ownership of, or encumbrance upon, even a single asset can implicate "the very heart of a

[debtor's or insider's] financial condition." *Feldman*, 500 B.R. at 437 (alteration in original).

This Court is persuaded by the reasoning in the Tenth Circuit's decision in *In re Joelson*,

427 F.3d 700 (10th Cir. 2005), *cert. denied sub nom. Joelson v. Cadwell*, 547 U.S. 1163 (2006),

which advocates for the strict interpretation based upon (1) the text, structure, and policy of the

Bankruptcy Code; (2) the legislative history of the Bankruptcy Code; and (3) United States

Supreme Court precedent.[17] The Court therefore will join its sister courts and adopt the majority

---

[17] First, the strict interpretation conforms to the definition of "insolvent" in §§ 101(32)(A) and (C), in which the term "financial condition" refers to "difference[s] between an entity's overall property and debts—the entity's net worth." *Joelson*, 427 F.3d at 706–07. In addition, the strict interpretation also conforms to the "overall structure" of § 523(a)(2), which permits discharge of oral statements about a borrower's "financial condition" under § 523(a)(2)(A) but does not permit discharge of written statements about a borrower's "financial condition" under § 523(a)(2)(B). The strict interpretation essentially gives debtors more "leeway," i.e., dischargeability, with respect to false *oral* statements, which are more likely to include inadvertent mistakes, respecting their financial condition than it does to false *written* statements respecting the same. *Id.* at 707.

Second, the strict interpretation finds support in the legislative history of the Bankruptcy Code. Before the 1960 amendments to the Bankruptcy Code, "if a debtor had obtained property on credit through the use of an oral misrepresentation, *that particular debt* would be excepted from discharge; if a debtor had obtained property on

view. *See Witmer*, 541 B.R. at 782; *Feldman*, 500 B.R. at 437; *In re Campbell*, 448 B.R. 876,

886 (Bankr. W.D. Pa. 2011). Pursuant to the strict interpretation of the term "financial

condition," borrowing base certificates do not qualify as written statements about a borrower's

financial condition as required by § 523(a)(2)(B)(ii).

3.    Reasonable Reliance Under § 523(a)(2)(B)(iii)

Section 523(a)(2)(B)(iii) requires that the creditor actually relied on the written statement

and that such reliance was reasonable. *Field v. Mans*, 516 U.S. 59, 68 (1995); *accord Chan*, 2008

WL 5428271, at *18. "[T]he reasonableness issue under § 523(a)(2)(B) is *not* whether it was

reasonable for the Plaintiff to have invested in the Debtor's business, but whether it was

reasonable for [it] to have relied upon the Debtor's statements . . . without making further

inquiries before deciding to invest." *Chan*, 2008 WL 5428271, at *20.

---

credit through the use of a written misrepresentation, *none of the debtor's debts* could be discharged," pursuant to the predecessor statute to § 523(a)(2). *Id.* at 708 (emphasis added). As a result, some creditors encouraged debtors to submit written statements omitting liabilities (which would allow the creditor to later claim that such statements were false), extended credit thereupon, and then used such false statements in subsequent bankruptcies to "intimidate" debtors into agreements whereby the creditor agreed not to oppose the discharge of all of the debtor's debts if the debtor agreed to pay the creditor's debt "in full after discharge." *Id.* To curb such abuses, Congress amended the predecessor statute so that false written statements "no longer barred the discharge of all of an individual debtor's obligations." *Id.*

The legislative history to the 1960 amendments referenced the term "financial statement" seven times, assigning the term "financial condition" a "strict, established meaning." *Id.* at 708–09. In 1978, Congress recodified the predecessor statute into §§ 523(a)(2)(A) and (B) and did not intend to alter the predecessor statute. *Id.* at 709. Moreover, the reference to the business use of financial statements to "establish credit standing" in the legislative history to the 1960 amendments also supports the strict interpretation because it identifies statements respecting one's "overall financial condition that are typically used to establish such standing." *Id.*

Finally, in *Field v. Mans*, 516 U.S. 59 (1995), although it "did not address the issue directly," the Supreme Court "freely substituted the phrases 'statement of financial condition' and 'financial statement' for the phrase 'statement respecting the debtor's . . . financial condition.'" *Joelson*, 427 F.3d at 710; *see also Field*, 516 U.S. at 64, 76–77 (stating, for example, that § 523(a)(2)(B) excepts from discharge "debts traceable . . . to a materially false *financial statement*," and that, with respect to the 1978 recodification, "Congress wanted to moderate the burden on individuals who submitted *false financial statements*, not because lies about *financial condition* are less blameworthy than others," but to curb abuses by consumer finance companies) (emphasis added). As the former terms have "established meanings that involve an individual or entity's overall financial health," the same meaning should be given to the latter. *Joelson*, 427 F.3d at 710 (citing Black's Law Dictionary (8th ed. 2004)).

- 35 -

Whether it was reasonable for a creditor to rely on a written statement is determined pursuant to an objective standard, "i.e., that degree of care which would be exercised by a reasonably cautious person in the same business transaction under similar circumstances." *Cohn*, 54 F.3d at 1117. Such a determination implicates:

> (1) the creditor's standard practices in evaluating credit-worthiness (absent other factors, there is reasonable reliance where the creditor follows its normal business practices); (2) the standards or customs of the creditor's industry in evaluating credit-worthiness (what is considered a commercially reasonable investigation of the information supplied by debtor); and (3) the surrounding circumstances existing at the time of the debtor's application for credit (whether there existed a "red flag" that would have alerted an ordinarily prudent lender to the possibility that the information is inaccurate, whether there existed previous business dealings that gave rise to a relationship of trust, or whether even minimal investigation would have revealed the inaccuracy of the debtor's representations).

*Id.*; *accord Chan*, 2008 WL 5428271, at *18. "[T]he greater the distance between the reliance claimed and the limits of the reasonable, the greater the doubt about reliance in fact." *Field*, 516 U.S. at 76. In other words, "reasonableness goes to the probability of actual reliance." *Id.*

### 4.    Intent to Deceive Under § 523(a)(2)(B)(iv)

Section 523(a)(2)(B)(iv) will rarely be proven by direct evidence because a debtor "will rarely, if ever, admit that deception was his purpose." *Cohn*, 54 F.3d at 1118. The intent to deceive requirement therefore may be "inferred from the totality of the circumstances." *Id.* at 1118–19; *accord Chan*, 2008 WL 5428271, at *17. Moreover, it is sufficient that the debtor exhibited mere "reckless indifference to, or reckless disregard of," the truth of his statements concerning his or an insider's financial condition. *Cohn*, 54 F.3d at 1119.

"A writing is published under this subsection if it is 'either written by the debtor, signed by the debtor, *or* adopted and used by the debtor.'" *Chryst*, 177 B.R. at 500 (quoting *In re Martz*, 88 B.R. 663, 671 (Bankr. E.D. Pa. 1988)); *see also Braathen*, 364 B.R. at 700 ("The writing requirement is satisfied if the written statement was signed, adopted and used, or caused to be

prepared by, the debtor."). Moreover, the Third Circuit has suggested that, if an agent commits fraud, such fraud may be imputed to the principal under § 523(a)(2)(B)(iv), to the extent that the agent commits the fraud within the scope of the agency.[18] *Cohn*, 54 F.3d at 1119.

     5.    HiFi's Borrowing Base Certificates and Financial Statements

     Fulton argues that the HiFi Guaranty Claim is nondischargeable under § 523(a)(2)(B) based upon false information contained in the Certificates and HiFi's financial statements.

     *a.    HiFi's Borrowing Base Certificates*

     Although Fulton based most of its case at trial on the falsity of the Certificates, as discussed above, the Court has concluded that the Certificates cannot be considered a written statement about HiFi's financial condition under § 523(a)(2)(B)(ii). In fact, the Certificates submitted by HiFi completely omitted HiFi's income and retained earnings and did not include HiFi's other assets such as its automotive equipment, furniture and fixtures, improvements, insurance, and goodwill, which accounted for nearly one-third of HiFi's total assets from 2012 to 2013.[19] In addition, the Certificates omitted nearly half of HiFi's total liabilities.[20]

---

[18] Under Pennsylvania law, "a principal is liable to third parties for the frauds, deceits, concealments, [and] misrepresentations . . . of his agent committed within the scope of his employment even though the principal did not authorize, justify, participate in or know of such conduct." *Aiello v. Ed Saxe Real Estate, Inc.*, 499 A.2d 282, 285 (Pa. 1985); *see also* Restatement (Third) of Agency § 5.03 (Am. Law Inst. 2006) ("For purposes of determining a principal's legal relations with a third party, notice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal . . . ."). Such imputation principles serve the public policy "that it is more reasonable that when one of two innocent persons must suffer from the wrongful act of a third person, that the principal who has placed the agent in the position of trust and confidence should suffer, rather than an innocent stranger." *Aiello*, 499 A.2d at 285.

[19] HiFi's accounts receivable and inventory comprised only 69% of its total assets on its balance sheet for the year-ended December 31, 2011; only 64% for the quarter-ended March 31, 2012; only 70% for the quarter-ended September 30, 2012; only 70% for the year-ended December 31, 2012; only 71% for the quarter-ended March 31, 2013; only 69% as of June 30, 2013; and only 68% as of August 31, 2013. Joint Exs. 8, 29, 31–34.

[20] HiFi's maximum borrowing amount comprised only 48% of its total liabilities on its balance sheet for the year-ended December 31, 2012; only 52% for the quarter-ended March 31, 2013; only 52% as of June 30, 2013; and only 54% as of August 31, 2013. Joint Exs. 8, 31–34.

Moreover, even if the Court had adopted the minority view and considered the

Certificates in its analysis of Fulton's § 523(a)(2)(B) claim, it is clear that Fulton did not actually

rely upon the Certificates in extending the Initial HiFi Loans in June of 2012 as required by

§ 523(a)(2)(B)(iii) because HiFi only began submitting Certificates to Fulton in September of

2012. In addition, Fulton failed to provide any evidence at trial that it actually relied upon the

Certificates in extending the Second HiFi Loan in January of 2013. Indeed, based upon Fulton's

significant lack of oversight over HiFi's compliance with Fulton's borrowing base certificate

requirements, it is questionable whether Fulton actually or reasonably relied upon the

Certificates for any purpose.[21]

Because the Certificates do not constitute statements regarding HiFi's financial condition

as required under § 523(a)(2)(B)(ii), the Court will deny Fulton's nondischargeability claim to

the extent that it is based upon allegedly false statements contained in the Certificates.

> *b.*    *HiFi's Financial Statements*

Unlike the Certificates, HiFi's independently reviewed year-end financial statements and

internally prepared interim financial statements qualify as written statements reflecting HiFi's

financial condition under the strict interpretation of the term "financial condition." *Feldman*, 500

B.R. at 437 (quoting *Joelson*, 427 F.3d at 711–12). HiFi's financial statements also satisfy the

other requirement of § 523(a)(2)(B)(ii), that the written statement pertain to an insider of the

---

[21] Ashley's testimony and the exhibits presented at trial demonstrate that Niedziejko could not specifically recall reviewing most of the Certificates and substantially disregarded Fulton's policies when she allegedly reviewed the Certificates. As discussed above, although Fulton required the Certificates to be submitted by the fifteenth day of each month, signed, and filed with a detailed accounts receivable aging report, Niedziejko: (1) ignored that HiFi failed to submit any Certificates for the first three months of its relationship with Fulton; (2) routinely accepted late Certificates thereafter; (3) accepted fifteen of the nineteen Certificates without signatures; and (4) accepted all of the Certificates without detailed reports. Tr. Apr. 13, 105:21–106:10, 166:2–10, 171:16–18, 172:1–4; Tr. Apr. 22, 157:20–25, 158:9–13, 160:9–12. Thus, Fulton did not substantially follow its own practices or industry standard practices with respect to its review of the Certificates. As a result, to the extent that Fulton did rely on the Certificates, such reliance was unreasonable.

Debtor, because the Debtor was an officer of HiFi as required under the definition of "insider" pursuant to § 101(31)(A)(iv).

Although HiFi's financial statements qualify as written statements related to HiFi's "financial condition," the only financial statements which can be considered a basis for determining the nondischargeability of the HiFi Guaranty Claim under § 523(a)(2)(B) are the financial statements provided to Fulton before HiFi obtained an extension of credit from Fulton. *See Booher*, 284 B.R. at 200–01. Thus, the only financial statements which are relevant to this Court's determination of nondischargeability are the financial statements provided by HiFi to Fulton prior to the extension of the Initial HiFi Loans in June of 2012 and the Second HiFi Loan in January of 2013. Fulton, however, did not focus on these two points in time in its Adversary Complaint, at trial or in its post-trial briefing, and based its case on alleged inaccuracies contained in the financial statements provided by HiFi to Fulton after the HiFi Loans were extended.

For instance, Fulton generally argues that a significant amount of HiFi's accounts receivable were not collectible within a year, and therefore should not have been listed as current assets in HiFi's financial statements. Fulton Conclusions ¶ 1.d, ECF No. 64. However, Fulton has not provided a shred of evidence that the accounts receivable listed in the financial statements provided by HiFi to Fulton, in connection with either the Initial HiFi Loans in June of 2012 or the Second HiFi Loan in January 2013 (collectively, "Financial Statements"), were false.[22]

---

[22] Although Fulton also alleges that HiFi's practice of advanced billing skewed its financial statements, this practice did not begin until sometime in 2013 after the HiFi Loans had already been extended. Thus, any effect that such practice would have had on financial statements necessarily would not have impacted the Financial Statements at issue here.

Other than admitting copies of the Financial Statements into the record, Fulton did not

provide any testimony or documents which pertain to any of the accounts receivable listed in the

Financial Statements. Rather, Fulton relies upon the fact that HiFi generally engaged in the

practice of refreshing invoices as evidence that the list of "current" accounts receivable in the

Financial Statements must have been false. However, although the practice of refreshing invoices

may constitute evidence that some of the Certificates were false, there is no evidence in the

record that such practice had any impact on the Financial Statements. "Current" accounts

receivable only need to be collectible within one year in order to be compliant with GAAP, and

Fulton failed to provide any evidence that any of the "current" accounts receivable listed in the

Financial Statements were not collectible within one year.

Moreover, Spevak credibly testified that he had previously been told that HiFi's refreshed

invoices were collectible within one year and, therefore, did not reference the practice in any of

HiFi's financial statements. In addition, DuFrayne testified that the practice of refreshing

invoices was immaterial with regard to HiFi's financial statements because HiFi's accounts

receivable could simultaneously be more than ninety days past due and still be collectible within

one year as required by GAAP. Tr. Apr. 11, 211:7–213:4. Accordingly, DuFrayne did not

believe that the practice "skewed" HiFi's financial statements. *Id.* at 176:7–15. Indeed, based

upon the testimony provided by HiFi's representatives, it is clear that the only way to determine

whether any of the "current" accounts receivable listed in the Financial Statements were false

would have been to review the actual invoices kept by individual sales people at HiFi related to

the "current" accounts receivable in the Financial Statements. However, Fulton failed to provide

any evidence about these accounts receivable at trial.

Fulton also argued that HiFi's accounts receivable were overstated. Fulton Conclusions ¶ 1.c. As evidence of this, Fulton points to the results of Bressler's field exam of HiFi's accounts receivable, which suggested that (1) HiFi determined that only 2% of its accounts receivable more than ninety days past-due were collectible; (2) 55% of HiFi's accounts receivable more than ninety days past-due were not current assets; and (3) $775,000 of the $1.4 million of eligible accounts receivable listed on HiFi's February 2014 borrowing base certificate had been refreshed at least once.[23] Fulton Post-Trial Br. 31, ECF No. 65. However, because Bressler's exam was limited to HiFi's accounts receivable from March 2013 to March 2014, her statements have no impact on the veracity of the accounts receivable in the Financial Statements. Tr. Apr. 12, 139:13–21. Moreover, DuFrayne credibly testified that the dismal statements in Bressler's report about the collectability of those accounts receivable were based upon HiFi's inability to collect such accounts receivable because it had already ceased operations.

Finally, Fulton argues that the Financial Statements were materially false because HiFi failed to maintain supporting documentation in connection with its practice of refreshing invoices, thus preventing Fulton from determining whether HiFi's accounts receivable "were valid, or . . . collectible at all." Fulton Conclusions ¶ 9. However, the lack of supporting documentation in connection with HiFi's practice of refreshing invoices does not prove anything and does not even come close to satisfying Fulton's burden of proof in this regard.

---

[23] Fulton also references the "negligible" proceeds it netted when it liquidated HiFi's accounts receivable in August 2014 as evidence that HiFi's accounts receivable were overstated. Fulton Post-Trial Br. 34. However, DuFrayne credibly testified that when Fulton liquidated HiFi's accounts receivable, they were rendered mostly uncollectible because HiFi had been closed for four weeks. Tr. Apr. 11, 201:20–24, 205:6–11, 206:9–19.

For example, Fulton presented extensive testimony that HiFi's inadequate record keeping

hindered Bressler's efforts to determine the extent to which HiFi overstated its accounts

receivable between March 2013 and March 2014. Accordingly, Fulton argues:

> *There is no way to determine the precise amount that these representations were*
> *overstated,* as HiFi has no records in support of the vast majority of its invoices for
> most of this period; that is to say there are no records of signed contracts, no signed
> proposals, no drawings with measurements for installation, no parts lists showing
> the required components and associated hardware, no specification sheets
> identifying specifications of components, no record of correspondence with the
> customers; in short, no record or copy of anything that would serve to substantiate
> that any goods or services were ever provided. We do know that for many years,
> HiFi had engaged in refreshing its accounts receivable, and had no records as to:
> the original date of refreshed invoices; which invoices were refreshed; or the dates
> that they were refreshed, other than the last date that was reflected before this
> practice came to an end, at the end of the Company's existence. . . . We do know
> that neither the Debtor, nor Patricia Zwaan, nor Paul Sandquist have any idea as to
> how the actual age of most of the refreshed accounts receivables might be
> determined.

Fulton Post-Trial Br. 30–31 (emphasis added). However, Fulton was required to present such

evidence at trial in order to satisfy its burden of proof under § 523(a)(2)(B), and it has failed to

do so.

Moreover, as discussed above, Fulton only produced information about HiFi's accounts

receivable from March 2013 to March 2014, which is after the time that Fulton extended the

HiFi Loans. HiFi's failure to keep proper documentation of its practice of refreshing invoices

related to these accounts, therefore, has no bearing on this Court's determination about the

veracity of the "current" accounts receivable listed in the Financial Statements. In order to

determine whether HiFi's practice of refreshing invoices had any effect on the "current"

accounts receivable listed in the Financial Statements (i.e., whether those accounts were

collectible within one year of being invoiced), Fulton would have had to review the actual

invoices kept by individual sales people at HiFi related to such accounts. Fulton failed to produce

this information at trial, so it necessarily cannot demonstrate that the accounts receivable in the
Financial Statements were materially false as required under § 523(a)(2)(B)(i).

Fulton also argues that the Financial Statements were materially false as to HiFi's
inventory because HiFi never took steps to value its inventory at the lower of cost or market, as
required under GAAP. Fulton Conclusions ¶¶ 1.e, 10. As evidence of this, Fulton references
(1) Mesnick's testimony that "HiFi's inventory was extremely susceptible to emerging
technology," and therefore prone to obsolescence; (2) the discrepancies that DuFrayne and
Mesnick discovered between HiFi's general ledger and its inventory perpetual; and (3) the fact
that Fulton netted only $1.3 million when it liquidated HiFi's inventory in August 2014. Fulton
Post-Trial Br. 32–34.

Once again, Fulton failed to provide any evidence that the value of the inventory listed in
the Financial Statements was false. Fulton did not provide expert testimony about the value of
any of HiFi's inventory, much less the value of the inventory listed in the Financial Statements.
In contrast, the Debtor credibly testified that HiFi's high-end inventory maintained, and
sometimes increased, its value over time. Because Fulton did not present contrary evidence
(other than the testimony of Mesnick, who was not qualified to testify as an expert and did not
appear to have any experience valuing high-end audio visual inventory), it is fair to presume that
HiFi did not go through the motions of evaluating whether its inventory was properly valued
because it knew that its inventory, at the very least, maintained its value over time.

In addition, as DuFrayne testified, the $300,000 to $500,000 discrepancy between HiFi's
inventory on its general ledger and its inventory perpetual was immaterial in the context of
HiFi's overall inventory of $3 million. Tr. Apr. 11, 213:11–214:7. And, as Mesnick admitted at
trial, although HiFi's inventory perpetual overstated its inventory by 4.3%, such overstatement

was also immaterial. Tr. Apr. 12, 78:1–3, 80:2. Finally, to the extent that the liquidation value of HiFi's inventory was less than the cost of HiFi's inventory as listed on its 2014 financial statements, that shortfall has no impact on this Court's determination of the value of HiFi's inventory in the Financial Statements, and there was no evidence given that HiFi was required to list the liquidation value of its inventory in its financial statements under GAAP.

In sum, HiFi's Financial Statements were not materially misstated as to either its accounts receivable or inventory. The Court therefore cannot conclude that, had Fulton, or a "reasonable" creditor, known of HiFi's "true financial condition," it would not have extended the HiFi Loans. *Cohn*, 54 F.3d at 1114–15 (quoting *Bogstad*, 779 F.2d at 375). Accordingly, Fulton has not satisfied its burden of proof under § 523(a)(2)(B)(i) as it applies to HiFi's Financial Statements.

Fulton also failed to prove at trial that the Debtor caused HiFi's Financial Statements to be published "with the intent that the Bank be deceived into lending more money to HiFi than would have been otherwise loaned." Fulton Conclusions ¶ 13. Fulton argues that the Court must infer such intent from the existence of HiFi's practice of refreshing invoices because the practice serves "no legitimate purpose . . . other than to deceive a lender."[24] Fulton Post-Trial Br. 49. Alternatively, Fulton argues that the Debtor was at least recklessly indifferent as to the truth and accuracy of the Certificates and financial statements because he entrusted HiFi's finances to Sandquist and Zwaan despite their lack of credentials, and subsequently failed to supervise them

---

[24] Fulton also suggests that the Debtor intended to deceive Fulton because the Debtor initiated HiFi's commercial lending relationship with Fulton shortly after M&T advised him that HiFi's accounts were to be transferred to M&T's collateral control team. Fulton Post-Trial Br. 50. However, Brightbill's observation at trial that many of M&T's customers were terminating their relationships with M&T at that time undercuts the inference that HiFi terminated its relationship with M&T in order to continue its alleged fraud against Fulton.

to ensure that HiFi complied with the loan agreements. Fulton Conclusions ¶ 14; Fulton Post-Trial Br. 52–53.

The Court finds that the weight of the evidence presented at trial demonstrates that the Debtor never intended to deceive Fulton when HiFi submitted the Financial Statements. In fact, the Debtor credibly presented himself at trial as a hard-working man with integrity. He was committed to HiFi and had worked there for almost forty years. For at least half that time, he acted as President and CEO and successfully operated HiFi during the many ups and downs in the market place. Indeed, at the outset of the relationship, Fulton's representatives had the same impression of the Debtor and this was a factor which supported its decision to begin lending to HiFi.

Given the Debtor's clear lack of financial education, training, and knowledge, which he never hid from Fulton, the Debtor appropriately delegated the preparation and review of the Financial Statements to HiFi's outside accountant, Spevak. Tr. Apr. 21, 195:23–25, 196:11–14; Tr. Apr. 22, 75:15–17, 141:20–23. Also, as previously discussed, Fulton failed to prove that HiFi's practice of refreshing invoices had any impact on the Financial Statements or that the Financial Statements were materially false. Fulton accordingly has also failed to satisfy its burden of proof under § 523(a)(2)(B)(iv) as it applies to HiFi's Financial Statements.[25]

Based upon the foregoing, the Court will deny Fulton's nondischargeability claim against the Debtor under § 523(a)(2)(B) in its entirety.

---

[25] Fulton also argues that any evidence regarding whether HiFi's practice of refreshing invoices was disclosed to Fulton, and therefore permitted under the loan agreements, is barred pursuant to the parol evidence rule and to the loan agreements' integration clauses. Fulton Post-Trial Br. 43–44. However, the Debtor's evidence of the disclosure of the practice was not intended to modify its obligations under the loan agreements. Rather, the evidence was introduced to demonstrate the existence of a red flag that suggested that Fulton's reliance on the Certificates and financial statements was unreasonable. Therefore, such evidence is not barred by the parol evidence rule or the loan agreements' integration clauses.

### B.    Fulton's Nondischargeability Claim Under § 523(a)(6)

At the outset, the Court is constrained to note that it does not have jurisdiction to resolve

Fulton's § 523(a)(6) nondischargeability claim at this time, because it is unclear whether, and to

what extent, if any, Fulton suffered an injury in connection with the Debtor's Drawdown on the

Citizen Line. Both the Supreme Court and the Third Circuit have "cautioned against the practice

of assuming jurisdiction and reaching the merits of a dispute merely because a court concludes

that the suit can be dismissed on the merits assuming *arguendo* that jurisdiction exists." *Society*

*Hill Towers Owners' Ass'n. v. Rendell*, 210 F.3d 168, 175 (3d. Cir. 2000).

In *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998), the Supreme Court

observed that this practice creates "hypothetical jurisdiction" which "produces nothing more than

a hypothetical judgment—which comes to the same thing as an advisory opinion, disapproved by

this Court from the beginning." 523 U.S. at 101 (citations omitted).

A court must independently determine whether a plaintiff has constitutional standing to

proceed regardless of whether parties challenge the court's jurisdiction. *Id.* at 94. The Third

Circuit has summarized the requirements for constitutional standing as:

> (1) the plaintiff must have suffered an injury in fact—an invasion of a legally
> protected interest which is (a) concrete and particularized and (b) actual or
> imminent, not conjectural or hypothetical; (2) there must be a causal connection
> between the injury and the conduct complained of—the injury has to be fairly
> traceable to the challenged action of the defendant and not the result of the
> independent action of some third party not before the court; and (3) it must be likely,
> as opposed to merely speculative, that the injury will be redressed by a favorable
> decision.

*Society Hill Towers*, 210 F.3d at 175–76.

In the case at hand, Fulton does not have standing to pursue the § 523(a)(6)

nondischargeability claim against the Debtor at this time, since it has not yet sustained an injury

as a result of the Debtor's Drawdown on the Citizens Line. Fulton's injury is only hypothetical at

this point in time because, although the Drawdown has the potential effect of eroding up to

$232,791.81 of the outstanding balance of the Second Alyssa Note held by Fulton, the Property

has not yet been sold and, depending upon the ultimate sale price, Fulton may not sustain any

injury at all.

By way of background, the Debtor listed the value of the Property at $950,000 on

Schedule A, and Fulton did not present any other evidence at trial regarding the Property's value.

The current priority, and outstanding balance, of liens on the Property appear to be:

> (1) A first lien, up to the amount of $250,000, held by Citizens in connection with the
> Drawdown;
>
> (2) A second lien, up to the amount of $417,000, held by the buyer of the First Alyssa
> Note; and
>
> (3) A third lien, up to the amount of $232,791.81, held by Fulton as the holder of the
> Second Alyssa Note.

If the Property is sold for an amount above $899,791.81, Fulton will not have sustained

any injury as a result of the Drawdown because the Second Alyssa Note will be satisfied in full.

To the extent that the Property is sold for less than that amount, but more than $667,000, Fulton

will have sustained an injury equal to the difference between the sale price and the sum of the

outstanding balances of the first and second liens on the Property. If the Property is sold for less

than $667,000, Fulton will have sustained an injury equal to the outstanding balance on the

Second Alyssa Note, which was approximately $232,000 as of the filing of the Adversary

Complaint. At this date, however, it is impossible to determine whether, or to what extent, Fulton

will sustain an injury as a result of the Drawdown.

Based upon the foregoing, Fulton does not have standing to pursue the § 523(a)(6)

nondischargeability claim against the Debtor at this time and, therefore, this Court does not have

jurisdiction to determine this claim. The Court notes, however, that, even if Fulton sustains an

injury as a result of the Drawdown, Fulton's debt will be subject to discharge pursuant to

§ 523(a)(6) because the underlying injury was caused by a simple breach of contract, not an

intentional tort.

Section 523(a)(6) provides that "[a] discharge under section 727 . . . of this title does not

discharge an individual debtor from any debt . . . for willful and malicious injury by the debtor to

another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). Thus, two distinct

elements comprise a willful and malicious injury.

In order to constitute a willful injury, the Third Circuit has held that a debtor must act

"with the purpose of producing injury or . . . with substantial certainty of producing injury." *In re*

*Conte*, 33 F.3d 303, 307 (3d Cir. 1994). Merely because there was "a high probability of

producing harm . . . does not establish that [the Debtor's] conduct was substantially certain to

produce [an] injury." *Id.* at 309. Thus, "debts arising from recklessly or negligently inflicted

injuries do not fall within the compass of § 523(a)(6)." *In re Malloy*, Civ. A. No. 15-5046, 2016

WL 2755593, at *7 (E.D. Pa. May 11, 2016) (quoting *Kawaauhau v. Geiger*, 523 U.S. 57, 63–64

(1998)). Malice, on the other hand, "encompasses an injury that is 'wrongful and without just

cause or excuse, even in the absence of personal hatred, spite or ill-will.'" *In re Malloy*, 535 B.R.

81, 89 (Bankr. E.D. Pa. 2015) (quoting *In re Jacobs*, 381 B.R. 128, 136, 138–39 (Bankr. E.D. Pa.

2008), *aff'd*, Civ. A. No. 15-5046, 2016 WL 2755593 (E.D. Pa. May 11, 2016)).

As noted above, the "burden of proving that a debt is nondischargeable under § 523(a) is

upon the creditor, who must establish entitlement to an exception by a preponderance of the

evidence" and "exceptions to discharge are construed strictly against creditors and liberally in

favor of debtors." *Cohn*, 54 F.3d at 1114 (citing *Grogan*, 498 U.S. at 287–88); *Malloy*, 535 B.R.

at 88 (citations omitted).

- 48 -

A number of courts have held that § 523(a)(6) does not apply to damages incurred in connection with a simple breach of contract and that such damages can only be rendered nondischargeable under § 523(a)(6) to the extent that such breach was accompanied by tortious conduct. *See In re Grasso*, 497 B.R. 434, 445 (Bankr. E.D. Pa. 2013) (holding that "a creditor's demonstration that a debtor breached a contract is not sufficient to render nondischargeable the creditor's claim arising from that breach"); *In re Glenn*, Bankr. No. 1:11-bk-02164MDF, Adv. No. 1:11-ap-00324MDF, 2012 WL 3775977, at *3 (Bankr. M.D. Pa. Aug. 28, 2012) (holding that the debt incurred by debtors in connection with their failure to pay their mortgage was nondischargeable because debtors were also found to have intentionally damaged the real property, which secured the creditor's lien, by taking out fixtures when they vacated the real property); *In re Jacobs*, 381 B.R. 128, 138 (Bankr. E.D. Pa. 2008) (holding that "§ 523(a)(6) is not intended to render nondischargeable debts arising from simple breaches of contract").

Many of these courts have come to this conclusion based upon the Supreme Court's recognition in *Kawaauhau v. Geiger*, 523 U.S. 57 (1998), that expanding the "willful" element in § 523(a)(6) to cover breaches of contract would be "so broad [that it] would be incompatible with the 'well-known' guide that exceptions to discharge 'should be confined to those plainly expressed.'" 523 U.S. at 62.

In addition, other courts have come to this conclusion based upon one or more of the following reasons:

> (1) the terms "willful and malicious" have traditionally been used in the context of tort law not contract law; (2) the precursor to Section 523(a)(6) in the Bankruptcy Act of 1898 was generally applied only in situations of tortious conduct and Congress should be presumed to have intended to continue that practice when it chose to use the same terms in the 1978 Bankruptcy Code; (3) exceptions to discharge should be construed narrowly; (4) a policy of making intentional breaches of contract non-dischargeable is inconsistent with the policy behind Section 365(a) which authorizes a debtor in possession to reject executory contracts; (5) the

potential for a breach of contract and the ensuing economic damage is foreseeable by both contracting parties; and (6) making damages for breach of contract non-dischargeable whenever the breach was foreseeable would vastly decrease the number of dischargeable debts.

*In re Snyder*, 542 B.R. 429, 444 (Bankr. N.D. Ill. 2015).[26]

Based upon the foregoing, it is clear that, even if Fulton does have standing in the future to pursue a nondischargeability claim under § 523(a)(6) against the Debtor, Fulton's claim will be discharged since it relates only to a simple breach of contract. In its Adversary Complaint and at trial, the only basis alleged by Fulton in support of its § 523(a)(6) claim against the Debtor is the Debtor's breach of the Pay-Off Notice. Fulton does not allege that the Debtor engaged in any tortious conduct in connection with the Drawdown.[27] Therefore, any future claim made by Fulton for damages related to the Drawdown would be discharged since it would only relate to a simple breach of contract.

Although the Debtor raised the affirmative defense of unclean hands in his Answer, it is unnecessary for this Court to reach that issue since it has already determined that Fulton's claims are dischargeable.

---

[26] *See also Lockerby v. Sierra*, 535 F.3d 1038, 1042 (9th Cir. 2008) ("Expanding the scope of § 523(a)(6) to include contracts that are intentionally breached whenever it is substantially certain that injury will occur would severely circumscribe the ability of debtors to 'start afresh.'"); *In re Best*, 109 F. App'x 1, 8 (6th Cir. 2004) ("Consistent with *Geiger*, we have held that a breach of contract cannot constitute the willful and malicious injury required to trigger § 523(a)(6)."); *In re Flakker*, Bankr. No. 14-00340, Adv. No. 14-10037, 2015 WL 4624545, at *3 (Bankr. D.D.C. Aug. 3, 2015) ("The plaintiff's breach of contract claim is insufficient, on its own, to state a nondischargeability claim under § 523(a)(6), but coupled with the plaintiff's allegations of fraud, the allegations of breach of contract adequately allege a nondischargeability claim under § 523(a)(6)."); *In re Iberg*, 395 B.R. 83, 89 (Bankr. E.D. Ark. 2008) ("[I]t is a well-settled principle of law that 'a simple breach of contract is not the type of injury addressed by § 523(a)(6).'").

[27] In fact, Fulton admitted at trial that its representatives were actually responsible for creating the circumstances which allowed the Debtor to take the Drawdown by failing to ensure that the Citizens Line was closed.

## IV.    CONCLUSION

Fulton's claim against the Debtor in connection with his guaranty of HiFi's commercial loans with Fulton will be discharged in the Debtor's bankruptcy proceeding because Fulton has failed to demonstrate that: (1) the financial statements relied upon by Fulton in providing commercial loans to HiFi in June of 2012 and January of 2013 were materially false; or (2) the Debtor intended to deceive Fulton in submitting such financial statements. The Court also holds that it does not have jurisdiction to rule on Fulton's nondischargeability claim under § 523(a)(6) because Fulton has not yet sustained an injury in connection with such claim. Judgment therefore will be entered in favor of the Debtor and against Fulton in this adversary proceeding.

An appropriate order follows.

Date:    December 21, 2016

Honorable Ashely M. Chan
United States Bankruptcy Judge